NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 241087-U

NO. 4-24-1087

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 2, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* B.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
|     Petitioner-Appellee, | ) | No. 21JA429 |
|     v. | ) | |
| Conah E., | ) | Honorable |
|     Respondent-Appellant). | ) | David A. Brown, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Doherty and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court granted counsel's motion to withdraw and affirmed the trial court's judgment terminating respondent's parental rights, as no issue of arguable merit could be raised on appeal.

¶ 2    Respondent, Conah E., appeals from the trial court's judgment finding him unfit and terminating his parental rights as to his minor child, B.B. (born in 2021). The court also terminated the parental rights of the minor's mother, Pamela B., who is not a party to this appeal. Respondent timely appealed, and the court appointed counsel to represent him.

¶ 3    Counsel now seeks to withdraw pursuant to the procedure set forth in *Anders v. California*, 386 U.S. 738 (1967). See *In re S.M.*, 314 Ill. App. 3d 682, 685-86 (2000) (holding *Anders* applies to termination of parental rights cases and outlining the proper procedure appellate counsel should follow when moving to withdraw). In her supporting brief, counsel contends any argument she might make would be meritless. Respondent was given notice that he had the

opportunity to respond to the motion to withdraw, but he did not file a response. For the following reasons, we grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5        On November 27, 2021, the State filed a petition alleging that B.B. was neglected pursuant to section 2-3 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3 (West 2020)). As to respondent, the State alleged that he (1) was found unfit in a different Peoria County case in 2019, and there had not been a subsequent finding of fitness, (2) was a registered juvenile sex offender, and (3) had a history of mental health and substance abuse issues. Respondent and one other individual were designated as putative fathers of B.B. Neither appeared at the shelter care hearing on November 30, 2021. Respondent likewise did not appear at the arraignment on December 7, 2021. An affidavit for service by publication, filed December 9, 2021, stated that respondent could not be found within Illinois and his last known address was in Oklahoma. The State filed a certificate of publication on December 20, 2021. On January 10, 2022, the court found respondent to be in default by publication.

¶ 6        On January 25, 2022, the trial court found B.B. neglected, made him a ward of the court, and placed him in the guardianship of the Illinois Department of Children and Family Services (DCFS). The court additionally found that B.B.'s mother was unfit. The court made no findings as to respondent and the other putative father but ordered both putative fathers to have no contact with B.B. as long as their status remained putative.

¶ 7        Respondent did not appear at the permanency hearings on July 25, 2022, and January 10, 2023. In July 2022, the trial court established a permanency goal of returning home. In January 2023, the court changed the goal to substitute care pending court decision on termination of parental rights.

¶ 8        On January 12, 2023, the State filed a petition for writ of *habeas corpus ad prosequendum*, stating that respondent was in custody at North Fork Correctional Center in Sayre, Oklahoma, and requesting that the trial court direct the warden to make respondent available by Zoom on February 27, 2023. The court issued the corresponding order on January 13, 2023. A summons was addressed to respondent at North Fork Correctional Center, ordering him to appear at a hearing on February 27, 2023.

¶ 9        On February 2, 2023, the trial court received a letter from respondent that he was unable to attend the hearing on February 27, 2023, but that he "want[s] what's best for [his] son." Respondent ultimately appeared by Zoom at the hearing on that date, and he was ordered to complete a DNA test to determine paternity. At a permanency review hearing on June 17, 2023, the court vacated respondent's previous default.

¶ 10        DNA testing revealed that there was a 99.9% probability that respondent was the biological father of B.B. On August 8, 2023, the trial court found that respondent was the legal father of B.B.

¶ 11        The trial court held a second dispositional hearing, pertaining only to respondent, on October 30, 2023. The court found respondent unfit and unable to care for B.B. on the basis of his "criminality; substance abuse; [and] current incarceration."

¶ 12        The State filed a petition for termination of parental rights of both respondent and B.B.'s mother on January 12, 2024. It alleged that respondent was unfit under section 1(D)(r) of the Adoption Act (750 ILCS 50/1(D)(r) (West 2022)) because he was incarcerated at the time that the petition was filed, he had little to no contact with or provided little to no support for B.B., and his incarceration would prevent him from discharging his parental responsibilities for B.B. in excess of two years after the petition was filed. Respondent did not answer the petition. On March

20, 2024, the trial court found respondent in default for failure to appear. On May 23, 2024, respondent filed a motion to vacate the default and attached his response to the petition, which denied the State's allegations against him. The court granted the motion and vacated respondent's default on May 28, 2024. At a permanency hearing on June 10, 2024, the court found that respondent had not made reasonable progress.

¶ 13    The trial court held the unfitness hearing on August 5, 2024. The State asked the court to take judicial notice of the prior pleadings, petitions, and orders while ignoring any hearsay or reports in the file. The court granted the request over the mother's objection. Without objection, the court admitted a certified copy of respondent's conviction from Oklahoma of two counts of indecent or lewd acts with a child.

¶ 14    The State then called the first witness, DCFS caseworker Maria Leitner. Leitner testified that she had been the caseworker for B.B. since December 2022. Since that time, respondent had not had any visitation with B.B. She testified that after respondent was established as the legal father, DCFS decided not to support visitation between respondent and B.B. because respondent did not have access to separate and private visitation and respondent's caseworker from the correctional facility "did not feel that that was appropriate." According to Leitner, respondent appealed the DCFS decision not to support visitation "but did not show [up] to the administrative appeal hearing." She testified that she had monthly contact with respondent beginning in February 2023, when respondent became a party to the case. During those conversations, respondent asked about visitation repeatedly. Leitner mailed respondent a picture of B.B. once, but respondent never received it because his correctional facility caseworker "said that [respondent] wasn't allowed to have it." Leitner testified that respondent had not had any contact with B.B. since B.B.'s birth.

¶ 15    Respondent's counsel then called respondent as a witness. He testified that he had been incarcerated since March 31, 2022, and had not had any contact with B.B. prior to that time because he did not know the mother was pregnant. He stated that he attempted to have contact with B.B. during these proceedings, but "DCFS has constantly been a roadblock" by deciding not to conduct visitation. It was his opinion, based on video visits with B.B.'s mother, that the kiosks for video visits were set up so that other inmates would not have seen or been seen by B.B., but he acknowledged that the kiosks were "on an open door." He testified that his projected parole date was March 29, 2039.

¶ 16    The State then argued that it had proved its petition by clear and convincing evidence as to respondent based on his projected parole date, which is "when the minor is over 18." Respondent's counsel argued that the trial court should deny the petition because "the father wasn't permitted to have contact by the agency."

¶ 17    The trial court found that the State had established the elements required by section 1(D)(r) of the Adoption Act (750 ILCS 50/1(D)(r) (West 2022)) because (1) on the date that the petition was filed, respondent was incarcerated, (2) respondent had no contact with B.B. before his incarceration, and (3) respondent's continued incarceration until at least 2039 would prevent him from discharging his parental responsibilities for B.B. for a period in excess of two years after the filing of the petition. The court also noted that one of the terms of respondent's Oklahoma sentence was that "he not reside, have direct or indirect contact or attempt to establish contact with a child under the age of 18," other than a biological son "to be born November of 2022." The court concluded that this referred to a child other than B.B., as B.B. had been born in 2021. Consequently, the court found that "blaming DCFS here in Illinois for the lack of contact *** is

largely irrelevant," especially in light of his inability to discharge his parental obligations in excess of two years from the filing of the petition.

¶ 18　　　　The trial court then proceeded to the best interest hearing. The State called Leitner as a witness again. She testified that B.B. was currently placed with a family that wanted to adopt him and had already adopted his brother. He lived with three adults and four other children. He was attached to all the children in the home, but especially his brother. The placement provided B.B. with a proper place to sleep, food, clothing, shelter, and educational and mental development. The foster parents provided for B.B.'s emotional and medical needs, and B.B. looked to them for security and safety, was soothed in their presence, had a strong bond with them, and called them "mom and dad."

¶ 19　　　　B.B.'s mother testified next. She discussed her visits with B.B. and stated that when she asked him, "[D]o you miss daddy?" he answered, "[Y]es, I miss daddy." She testified that B.B. was always "happy at the time to leave."

¶ 20　　　　Respondent's counsel did not submit any evidence. The State argued that terminating respondent's and the mother's parental rights was in B.B.'s best interest based on "virtually all the factors." Respondent's counsel asked the trial court to deny the petition regarding respondent.

¶ 21　　　　The trial court found that "neither parent is able to or any time in the near [future] would be able to provide for [B.B.'s] physical safety and welfare" or "food, shelter, clothing, [or] educational opportunities." The court emphasized that respondent was "incarcerated in another state for an extended period of time," neither parent could care for B.B., and B.B.'s brother had already been adopted by the same family.

¶ 22　　　　This appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24           After a full review of the record, appellate counsel concludes that the trial court's unfitness and best interest findings were not against the manifest weight of the evidence, despite two arguably meritorious issues regarding unfitness. We agree.

¶ 25                                    A. Unfitness

¶ 26           The involuntary termination of parental rights involves a two-step process pursuant to section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)). The State must first prove by clear and convincing evidence that the respondent is unfit. *In re C.M.*, 305 Ill. App. 3d 154, 163 (1999).

¶ 27           In this case, the trial court found respondent unfit under section 1(D)(r) of the Adoption Act (750 ILCS 50/1(D)(r) (West 2022)). Under this section, a parent is unfit if:

> "[(1)] The child is in the temporary custody or guardianship of [DCFS], [(2)] the parent is incarcerated as a result of criminal conviction at the time the petition or motion for termination of parental rights is filed, [(3)] prior to incarceration the parent had little or no contact with the child or provided little or no support for the child, and [(4)] the parent's incarceration will prevent the parent from discharging his or her parental responsibilities for the child for a period in excess of 2 years after the filing of the petition or motion for termination of parental rights." 750 ILCS 50/1(D)(r) (West 2022).

¶ 28           We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 54. A court's finding is against the manifest weight of the evidence "when the opposite conclusion is clearly apparent." *Dar. H.*, 2023 IL App (4th) 230509, ¶ 54.

¶ 29    Here, a review of the record reveals the State proved all four elements of section 1(D)(r), so the trial court's finding that respondent was unfit was not against the manifest weight of the evidence. B.B. was adjudicated neglected on January 25, 2022, and was in the temporary custody of DCFS since that time. On January 12, 2024, when the State filed the petition to terminate parental rights, respondent was incarcerated, having begun his incarceration on March 31, 2022. The State thus proved the first two elements of the statutory provision.

¶ 30    The record likewise supports the trial court's finding that the State proved the third element of section 1(D)(r) because respondent did not have contact with B.B. prior to his incarceration. Counsel identifies two potential issues with the court's finding on this element: (1) respondent testified that he did not know B.B.'s mother was pregnant before he was incarcerated and (2) DCFS's decision not to support visitation prevented respondent from contact with B.B. Neither issue changes our analysis of the third element given the plain meaning of the statute.

¶ 31    To find a parent unfit, the statute requires that "prior to incarceration the parent had little or no contact with the child or provided little or no support for the child." 750 ILCS 50/1(D)(r) (West 2022). We analyze a statute's construction *de novo*. *In re D.D.*, 196 Ill. 2d 405, 418 (2001). "The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature," as indicated by the plain and ordinary meaning of the language of the statute. *D.D.*, 196 Ill. 2d at 418-19. When the statute's language is "plain and unambiguous, courts may not read in exceptions, limitations, or other conditions." *D.D.*, 196 Ill. 2d at 419.

¶ 32    Here, the plain language of the third element under section 1(D)(r) considers only whether the parent had any contact with the child. It does not contemplate the *reason* for the lack of contact. The legislature could have added language to that effect—such as "the parent chose to

- 8 -

have no contact" or "the parent knew of the child but had no contact"—but it did not. Moreover, DCFS did not prevent respondent from contacting or supporting B.B. before he was incarcerated, and an Oklahoma court order prohibited respondent from contacting B.B. after the conviction for lewd and indecent acts with a child under 16 years old.

¶ 33    Lastly, the State proved the fourth element—that respondent's incarceration will prevent him from discharging his parental responsibilities for a period longer than two years—because his expected parole date is not until 2039.

¶ 34    Thus, appellate counsel is correct that any challenge to the trial court's unfitness finding under that section would be meritless, as the State clearly proved all four elements of section 1(D)(r).

¶ 35                                B. Best Interest

¶ 36    If a parent is found to be unfit, the State must then prove that terminating parental rights is in the minor's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this step, the focus shifts from the parent to the child. The burden on the State at the best interest hearing is a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366 (2004).

¶ 37    When determining a minor's best interest, the trial court must consider the following factors, "in the context of the child's age and developmental needs:"

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

¶ 38    The trial court's best-interest determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We afford great deference to the court's determination, as it is in the best position to view the witnesses and judge their credibility. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71.

¶ 39    The record reflects that respondent cares about his child and wants to establish a relationship with him. However, "at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*,

212 Ill. 2d at 364. As respondent had never met B.B. and will be incarcerated for the next 15 years, any argument that terminating his parental rights was not in B.B.'s best interest would have no merit. See *In re M.H.*, 2015 IL App (4th) 150397, ¶ 29 ("It is impossible to discharge parental responsibilities while being in prison."). B.B. has lived with his foster family for his entire life and has been well provided for. See 705 ILCS 405/1-3(4.05)(a) (West 2022). He had bonded with his foster parents, called them "mom and dad," was excited to go home to them after visitation with his mother, looked to them for security and safety, and was soothed in their presence. See 705 ILCS 405/1-3(4.05)(d), (g) (West 2022). He had also bonded with his biological brother, who his foster parents had already adopted. See 705 ILCS 405/1-3(4.05)(g) (West 2022). His foster parents have expressed their desire to adopt B.B. See 705 ILCS 405/1-3(4.05)(j) (West 2022). Considering all these factors, it was not against the manifest weight of the evidence for the trial court to find that terminating respondent's parental rights would be in B.B.'s best interest.

¶ 40        After examining the record, we agree that the issues counsel identified lack arguable merit, and we have identified no other arguably meritorious issues. We therefore grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 41                                    III. CONCLUSION

¶ 42        For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 43        Affirmed.