NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260075-U

NO. 4-26-0075

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 4, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Z.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macoupin County |
| Petitioner-Appellee, | ) | No. 22JA17 |
| v. | ) | |
| Bryan W., | ) | Honorable |
| Respondent-Appellant). | ) | Joshua Aaron Meyer, |
| | ) | Judge Presiding. |

___

JUSTICE KNECHT delivered the judgment of the court.
Justices Zenoff and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in finding respondent an unfit parent and terminating his parental rights.

¶ 2    Respondent, Bryan W., appeals the trial court's judgment finding him unfit and terminating his parental rights to Z.W. (born in January 2022). The court also terminated the parental rights of Z.W.'s mother, Taylar C., who is not a party to this appeal. On appeal, respondent challenges the court's finding he is an unfit parent under section 1(D)(r) of the Adoption Act (750 ILCS 50/1(D)(r) (West 2024)), arguing the court improperly found he had little or no contact with Z.W. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    On January 7, 2022, 10 days before Z.W.'s birth, respondent was charged with the delivery of over 15 grams but less than 100 grams of a substance containing methamphetamine.

He was incarcerated in the Montgomery County jail. Z.W. resided with his mother.

¶ 5        In May 2022, the State filed a petition alleging Z.W. was neglected under section 2-3(1)(b), (c) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b), (c) (West 2022)). The State asserted Z.W. was neglected in that, at birth, his cord blood tested positive for fentanyl (*id.* § 2-3(1)(c)), and his mother's drug use, evidenced by the mother's overdose on May 18, 2022, rendered the home an unsafe environment (*id.* § 2-3(1)(b)). Three days later, an amended petition was filed, asserting Z.W.'s guardian, his maternal grandmother, allowed Z.W. to be in his mother's care.

¶ 6        Approximately one year later, the trial court found Z.W. to be a neglected minor. Z.W. was made a ward of the court, and custody of Z.W. was placed with the Illinois Department of Children and Family Services (DCFS).

¶ 7        In May 2024, after a jury trial, respondent was sentenced to 25 years' imprisonment for methamphetamine delivery.

¶ 8        In October 2025, the State filed its motion to terminate the parental rights of both parents. The State alleged respondent was, at the time the petition was filed, incarcerated as a result of a criminal conviction. The State further alleged, before he was incarcerated, respondent had little or no contact with Z.W. or provided little or no support for him, and respondent's incarceration would prevent him from discharging his parental responsibilities for a period exceeding two years after the petition for termination was filed.

¶ 9        On November 17, 2025, the hearing on respondent's fitness was held. The trial court noted the October 2025 guardian *ad litem* report was part of the record. According to that report, an in-person visit between respondent and Z.W. occurred in August 2024 at Illinois River Correctional Center. Another visit occurred in February 2025. Z.W., a toddler at that time, was

transported approximately 510 miles round trip, during which he cried for approximately two and a half hours. In March 2025, DCFS determined in-person visits were not in Z.W.'s best interests. DCFS based this decision on the substantial travel burden, Z.W.'s age and distress, and the lack of an attachment due to respondent's lengthy incarceration. The guardian *ad litem* also summarized an interview with respondent. Although incarcerated, respondent wanted to build and maintain a relationship with Z.W. Respondent had requested visits for two years and received none until he contacted the DCFS Advocacy Office. Respondent completed two parenting classes and had written letters and sent cards to Z.W. Respondent reported having " 'eight years on paper' " left, with the potential for further reduction based on good-time credit.

¶ 10　　　　The State first called respondent to testify. According to respondent, his sentence had been reversed on appeal, but he was resentenced to 25 years. His appeal of that sentence was pending. Respondent's projected parole date was November 2033.

¶ 11　　　　The State next called Brianna Slightom, who testified she was the DCFS caseworker for this family. Slightom was assigned the case in March 2023, but during the period of June 2024 through February 2025, another person served as the caseworker. Slightom testified respondent and his son had a video visit in 2024, but she could not recall the date or month. She believed another video visit occurred in January 2025. Slightom stated the interim caseworker scheduled a visit in August 2024. Slightom agreed visits had been awarded. Because of the length of the drive to respondent, resulting in a 10- to 12-hour day for Z.W., the visits did not occur. Respondent had been instructed multiple times to put in for transfers to get closer to Z.W. Slightom agreed a visit to the Montgomery County jail would have required a four-hour drive round trip. Video visits were permitted in 2024, but those visits were unsuccessful because of the prison's procedures.

¶ 12    Respondent then testified on his own behalf. Before Z.W.'s birth, respondent talked to him through the mother's "stomach." Z.W. would respond to respondent's voice. Respondent believed "there was some type of bond." At that time, respondent was not in custody. Z.W. was born approximately 10 days after respondent's incarceration. After his incarceration, respondent would call home. He could hear Z.W. crying in the background. When respondent's voice was put on speakerphone, Z.W. would respond and become quiet. Respondent sent cards and letters to Z.W. Respondent presented records from the Illinois Department of Corrections showing mail had been sent from him to Z.W. on December 17, 2023, January 4, 2024, and October 7, 2024. While incarcerated, respondent had taken two parenting classes, a "jobs prep class," a substance-abuse program, and cooking programs. Respondent continued to improve himself. Respondent further reported making continuous efforts to be transferred to a facility closer to Z.W.

¶ 13    By written order, the trial court found the State proved respondent unfit by clear and convincing evidence. The court concluded respondent was incarcerated when the State filed its motion to terminate his parental rights and was sentenced to 25 years' imprisonment for the offense of methamphetamine delivery. Before his incarceration, the court found, respondent had little to no contact with the child or provided little or no support for the child. The court concluded the fact respondent was making efforts to improve himself during imprisonment had no effect on the State's proof he was unfit under section 1(D)(r) of the Adoption Act (750 ILCS 50/1(D)(r) (West 2024)).

¶ 14    After a hearing on Z.W.'s best interests, the trial court terminated the parental rights of both parents.

¶ 15    This appeal followed.

¶ 16                              II. ANALYSIS

¶ 17            On appeal, respondent challenges the trial court's finding of unfitness, asserting the court erred in concluding he had little or no contact with Z.W. before he was incarcerated as a result of a criminal conviction. Respondent, pointing to the time he spent speaking to Z.W. *in utero* and over the telephone while incarcerated, his correspondence with Z.W., and DCFS's conduct in not providing visits, contends the State did not clearly and convincingly prove him unfit. Respondent maintains "[h]e did the very best he could."

¶ 18            The State may seek the involuntary termination of parental rights under a two-step process under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)). The first step requires the State to prove by clear and convincing evidence the parent is unfit as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). See 705 ILCS 405/2-29(2) (West 2024).

¶ 19            Here, the trial court terminated respondent's parental rights to Z.W. after, in part, finding him unfit under section 1(D)(r) of the Adoption Act (750 ILCS 50/1(D)(r) (West 2024)). According to this section, a parent is unfit if the State clearly and convincingly proves the following:

> "[(1)] The child is in the temporary custody or guardianship of
> [DCFS], [(2)] the parent is incarcerated as a result of criminal
> conviction at the time the petition or motion for termination of
> parental rights is filed, [(3)] prior to incarceration the parent had
> little or no contact with the child or provided little or no support
> for the child, and [(4)] the parent's incarceration will prevent the
> parent from discharging his or her parental responsibilities for the

child for a period in excess of 2 years after the filing of the petition or motion for termination of parental rights." *Id.*

¶ 20    This court will, on appeal, reverse a finding of unfitness if that finding is against the manifest weight of the evidence. *In re M.H.*, 2015 IL App (4th) 150397, ¶ 22. Only when the opposite conclusion is clearly apparent upon review of the record will this court conclude a finding of unfitness is against the manifest weight of the evidence. *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 54.

¶ 21    The record reveals the finding of unfitness is not against the manifest weight of the evidence. When reading section 1(D)(r), giving the language its plain and ordinary meaning (see *In re D.D.*, 196 Ill. 2d 405, 419 (2001)), it is clear the legislature considered only the contact with the child and not the reason or reasons for the absence of such contact (see *In re B.B.*, 2024 IL App (4th) 241087-U, ¶ 32). Respondent's contact with Z.W. was "little." Z.W. was not yet born when respondent was taken into custody. In the first 28 months of Z.W.'s life, before respondent became incarcerated based on a criminal conviction, his contact was limited to speaking to Z.W. while Z.W. was *in utero* or over the telephone after his birth and a few in-person and video visits. The Adoption Act establishes "little or no contact with the child" prior to incarceration as grounds for unfitness. See 750 ILCS 50/1(D)(r) (West 2024). The opposite finding, that this contact was not "little," is not clearly apparent.

¶ 22                                III. CONCLUSION

¶ 23    We affirm the trial court's judgment.

¶ 24    Affirmed.