NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250480-U

NO. 4-25-0480

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 2, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.R.-M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 23JA107 |
| v. | ) | |
| Jacquelyn R.-M., | ) | Honorable |
| Respondent-Appellant). | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding that (1) the trial court's finding that respondent was unfit was not against the manifest weight of the evidence, (2) the court's finding that it was in the minor's best interest that respondent's parental rights be terminated was not against the manifest weight of the evidence, and (3) respondent forfeited her argument that the court violated her due-process rights by failing to properly develop the argument, as required by Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020).

¶ 2    Respondent, Jacquelyn R.-M., appeals the trial court's order terminating her parental rights as to her child, J.R.-M. (born in May 2023). Respondent argues that the court's finding that she was unfit was against the manifest weight of the evidence, the court's determination that termination of her parental rights was in J.R.-M.'s best interest was against the manifest weight of the evidence, and the court violated her right to due process by proceeding with the termination hearing in her absence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On May 8, 2023, the State filed a petition for adjudication of wardship concerning J.R.-M. The petition alleged that J.R.-M. was neglected in that he was in an environment injurious to his welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) because (1) his siblings had been adjudicated neglected and respondent had not made reasonable progress toward having them returned to her care and (2) respondent had mental health issues. That same day, the trial court entered a shelter care order finding there was probable cause to believe that J.R.-M. was neglected and granting the Illinois Department of Children and Family Services (DCFS) temporary custody and guardianship.

¶ 5    On September 28, 2023, the trial court entered an adjudicatory order finding, pursuant to respondent's stipulation, that J.R.-M. was neglected due to respondent's failure to cooperate with the services ordered in her older children's cases. (The court wrote "September 27, 2023," on the order as the date it was signed, but it was not filed until September 28, 2023, and the docket sheet indicates that the proceedings were held on September 28, 2023.)

¶ 6    On October 25, 2023, the trial court entered a dispositional order finding that (1) it was in J.R.-M.'s best interest that he be made ward of the court; (2) respondent was unfit, unable, or unwilling for some reason other than financial circumstances alone to care for, protect, train, educate, or supervise J.R.-M.; and (3) remaining in respondent's custody would jeopardize J.R.-M.'s health, safety, and best interest. The dispositional order granted custody and guardianship to DCFS.

¶ 7    On July 2, 2024, the State filed a motion for termination of parental rights, alleging that respondent was unfit in that she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2024));

(2) abandoned the minor (*id.* § 1(D)(a)); (3) deserted the minor for three months preceding the filing of the motion for termination of parental rights (*id.* § 1(D)(c)); (4) failed to make reasonable efforts to correct the conditions which were the basis for the minor's removal during the nine-month period from September 27, 2023, to June 27, 2024, following the adjudication of neglect (*id.* § 1(D)(m)(i)); and (5) failed to make reasonable progress toward the return of the minor during the nine-month period from September 27, 2023, to June 27, 2024 (*id.* § 1(D)(m)(ii)). The motion further alleged that termination of respondent's parental rights was in J.R.-M.'s best interest.

¶ 8         On May 8, 2025, a hearing was held on the State's motion for termination of parental rights. At the beginning of the hearing, the trial court noted that respondent was not present. DCFS caseworker Rachel Bridges advised the court that respondent told her that she had forgotten about the hearing and was on her way. The court asked respondent's counsel if he was ready to proceed. Respondent's counsel replied: "I am, with the proviso that should the State finish its case-in-chief before she arrives, when she arrives, I would like not to have a ruling on it then and there." The court replied, "All right." The court then asked the guardian *ad litem* if he was ready to proceed, and he stated that he was. The court then stated it would not wait for respondent because she was "chronically late," and it did not find it was "in anyone's best interest" to delay the hearing.

¶ 9         The State requested that the trial court take judicial notice of the adjudicatory order, the dispositional order, and all the other court orders in the case. The State also requested that the court admit into evidence six service plans and two certified copies of cases in which respondent's parental rights as to two of her other children had been terminated. The court admitted the exhibits. The service plans were dated March 28, 2023, May 10, 2023, September

- 3 -

18, 2023, March 25, 2024, May 3, 2024, and October 4, 2024. All six service plans indicated that DCFS had identified the following goals for respondent: (1) address her mental health, (2) maintain a safe home environment for the children, (3) improve her parenting skills, and (4) comply with DCFS's recommendations. Respondent's progress toward these goals was rated unsatisfactory in all of the service plans.

¶ 10     Bridges testified that she had been assigned to be the caseworker on J.R.-M.'s case since he was born, and he was currently two years old. Bridges stated that J.R.-M. was brought into care from birth because respondent had open cases involving two of her older children that were proceeding toward termination of parental rights. Bridges had been assigned to those cases as well. Bridges testified that she had prepared six service plans in connection with the case. Pursuant to the service plans, respondent was required to cooperate with DCFS, address her housing environment, complete mental health services, and complete parenting services. Bridges gave respondent a copy of the first service plan. However, after that, respondent refused to meet with Bridges at her office and did not have anywhere for Bridges to come meet her.

¶ 11     Bridges testified that respondent was evicted from her residence in June or July 2022, and she had been homeless since that time. She had lived in several homeless shelters while the case was opened. She had also been committed to a mental health ward in February or March 2025 for a period of time shortly after she gave birth to J.R.-M.'s younger sibling.

¶ 12     Bridges testified that the cases involving respondent's older children were initially opened for environmental neglect. She stated there was rotten food "all over" respondent's residence that her children were able to access and eat. There was also trash strewn throughout the home, and there were issues with mice and mold. When DCFS personnel started investigating the case, they also became concerned about respondent's mental health. Bridges

testified that when she asked respondent a question, respondent would typically not answer it but would instead tell a long story that was not pertinent to the question. Bridges stated that respondent still did not seem to fully understand how the condition of her home impacted the health of her children, saying "the house was just a little bit messy and that's what happens when you have young kids."

¶ 13 Bridges testified that DCFS had recommended that respondent engage in mental health services, and she referred respondent to a provider. Respondent engaged in an initial assessment in May 2024. The mental health provider recommended services, but respondent never participated in them. Respondent also completed an intake for parenting classes, but she never attended the classes and was discharged unsuccessfully. Bridges stated that respondent had not secured appropriate housing and did not have a source of income that could support her children. Bridges stated that respondent never completed any of the services recommended in the service plan.

¶ 14 According to Bridges, the only thing required of respondent in the service plans that she did consistently was maintain contact with Bridges via text messages. Bridges contacted respondent once per week or more, and respondent contacted her at about the same frequency. Bridges stated that when she contacted respondent, they discussed services, court dates, and things that were pertinent to her case. When respondent contacted Bridges, "it was about random topics that had nothing to do with her case at all." Respondent did not inquire about J.R.-M.'s well-being when she communicated with Bridges.

¶ 15 Bridges testified that respondent was initially given supervised visitation with J.R.-M. twice a week for two hours when he was a newborn, and this was reduced to once per week when he got older. Bridges personally supervised some of the visits and read the visitation

notes for others. The visits Bridges observed went well; respondent connected and interacted well with J.R.-M., changed his diaper, and fed him appropriately. A visitation specialist reported that respondent sometimes spent more time talking to staff members than being in the visitation room, but no other concerning matters were reported. Respondent's attendance at visitation was inconsistent. She would attend all weekly visits for a couple months and then miss two to three weeks in a row. Respondent last visited J.R.-M. in January 2024, when he was seven months old. DCFS had not determined that respondent could no longer have visits. As far as Bridges knew, respondent could have visited J.R.-M., but she chose not to.

¶ 16　　　　Bridges testified that, while respondent's visits with J.R.-M. went well, she did not display proper parenting skills during visits with her older children. Respondent had "no control" over the children's behavior, allowing them to run up and down the hallways and throw toys and trash all over the visitation room. Her oldest child spoke very rudely to staff, and when staff addressed those situations with respondent, she would say they were "kids being kids," and she was "letting them have fun."

¶ 17　　　　The trial court found respondent unfit as to all five grounds alleged in the motion for termination of parental rights. The court stated the "key issues" were respondent's mental health and parenting abilities. The court noted that, although respondent was able to "deal with a newborn child," she could not control the behavior of her older children. The court noted that she had been involuntarily committed to a mental health ward and that Bridges testified that respondent was not able to have a coherent conversation with her. The court stated that respondent had been referred for parenting classes and mental health services numerous times, and she failed to complete the services. The court also noted that respondent had failed to visit J.R.-M. for an extensive period of time.

¶ 18    The trial court stated that it would immediately proceed to a best-interest hearing. Respondent's counsel objected on the basis that respondent was still not present. The court stated respondent was 90 minutes late for the hearing at that point, and it would proceed. At the State's request, the court took judicial notice of the unfitness hearing and its order concerning unfitness.

¶ 19    Bridges testified that J.R.-M. had just turned two years old and was residing in a traditional foster home. He had been in his current placement since being released from the hospital at birth. He was reaching all his milestones, and his medical, emotional, and social needs were being met in his placement. J.R.-M. was bonded with his foster parents, and they were willing to adopt him. Bridges stated that J.R.-M. had not seen respondent since January 2024, and she believed adoption by his foster parents was in his best interest. She stated that it was the only home J.R.-M. had ever known, he was comfortable there, and he had a loving and bonded relationship with his foster parents and their extended family. J.R.-M.'s foster parents were willing to maintain connections with J.R.-M.'s siblings (who were in different placements), but they were not comfortable having a connection with respondent.

¶ 20    Respondent entered the courtroom while Bridges was testifying.

¶ 21    Respondent testified that she did not believe it was in J.R.-M.'s best interest that her parental rights be terminated because he needed to know his mother. She stated that it was important for children to have their genetic parents in their lives so they know about their family health history. She stated that she had not visited J.R.-M. since his first birthday because Bridges "shut those down." She was not sure why Bridges ended the visits. She stated Bridges texted her things that "mentally stressed [her] out," like she would lose her parental rights to J.R.-M. because she had lost her parental rights to her older children. When asked whether she voluntarily stopped visiting J.R.-M. or Bridges denied her visitation with him, respondent

replied, "It was neither. I don't think she denied it other than that she didn't want me to have visitation anymore because I had lost my parenting rights is what she told me." She stated she had been living at a homeless shelter for approximately one year, and it did not allow children.

¶ 22    The trial court stated it was considering all the statutory best-interest factors. The court noted that all of J.R.-M.'s needs were being met in his foster home, it was the only home he had known since being discharged from the hospital, and he was thriving. The court stated J.R.-M. appeared to be very secure and familiar with everyone in the home. The court found it was not in J.R.-M.'s best interest to be in foster care for an extended period of time and that he needed permanence. The court stated that giving respondent more time would not be useful, as she had not been making any progress for "quite some period of time." The court found it was in J.R.-M.'s best interest that respondent's parental rights be terminated.

¶ 23    The trial court entered a written order finding by clear and convincing evidence that respondent was unfit as to all five counts alleged in the motion for termination of parental rights. The court also entered a written order terminating respondent's parental rights to J.R.-M. upon determining that termination was in J.R.-M.'s best interest.

¶ 24    This appeal followed.

¶ 25                    II. ANALYSIS

¶ 26    On appeal, respondent argues that (1) the trial court's finding that she was unfit was against the manifest weight of the evidence, (2) the court's determination that termination of her parental rights was in J.R.-M.'s best interest was against the manifest weight of the evidence, and (3) the court violated her right to due process by proceeding with the termination hearing in her absence. We address each argument in turn.

¶ 27                    A. Unfitness

- 8 -

¶ 28 Respondent argues that the trial court's finding that she was unfit as to all five grounds of unfitness alleged in the motion for termination of parental rights was against the manifest weight of the evidence. Respondent contends there were significant mitigating circumstances in this case, including her homelessness, pregnancy with J.R.-M.'s younger sibling, and psychiatric hospitalization.

¶ 29 The involuntary termination of parental rights involves a two-step process and is governed by the Juvenile Court Act and the Adoption Act. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). First, the State must prove by clear and convincing evidence that the parent is "unfit" as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *C.W.*, 199 Ill. 2d at 210; see 705 ILCS 405/2-29(2) (West 2024). If the trial court finds the parent unfit, it then considers whether termination of parental rights is in the child's best interest. *C.W.*, 199 Ill. 2d at 210; see 705 ILCS 405/2-29(2) (West 2024).

¶ 30 Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) sets forth several grounds upon which a parent may be deemed unfit. Relevant here, section 1(D)(b) of the Adoption Act (*id*. § 1(D)(b)) provides that a person may be found to be unfit to have a child on the ground that such person "[f]ail[ed] to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." This section "includes all situations in which a parent's attempts at maintaining a reasonable degree of interest, concern, or responsibility are inadequate, regardless of whether that inadequacy seems to stem from unwillingness or an inability to comply." *In re M.I.*, 2016 IL 120232, ¶ 26. "Noncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under subsection (b)." *In re Jaron Z.*, 348 Ill. App. 3d 239, 259

(2004).

¶ 31    A trial court's determination that parental unfitness has been established by clear and convincing evidence will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). "A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." *Id.*

¶ 32    Here, the trial court's determination that respondent was unfit in that she failed to maintain a reasonable degree of interest, concern, or responsibility for J.R.-M.'s welfare was not against the manifest weight in the evidence. The evidence at the unfitness portion of the termination hearing showed that respondent had not visited J.R.-M. in approximately 16 months, and, before that, she attended her weekly supervised visits inconsistently. Although she spoke with Bridges weekly, she did not ask about J.R.-M. but instead discussed matters irrelevant to the case. Respondent's failure to visit J.R.-M. or ask how he was doing showed she failed to maintain a reasonable degree of interest or concern for his welfare. She also demonstrated a failure to maintain a reasonable degree of responsibility for J.R.-M.'s welfare by failing to complete or meaningfully engage in the services recommended under the service plan, including, *inter alia*, mental health counseling and parenting classes.

¶ 33    While the trial court also found respondent unfit on other grounds, we need not address them here, as only one ground of unfitness need be proven to enter a finding of unfitness. See *C.W.*, 199 Ill. 2d 198, 210 (2002) ("Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed 'unfit,' any *one* ground, properly proven, is sufficient to enter a finding of unfitness." (Emphasis in original.)); *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000) ("[O]n review, if there is sufficient evidence to satisfy any one statutory

ground we need not consider other findings of parental unfitness.").

¶ 34                                    B. Best Interest

¶ 35           Respondent argues that the trial court's determination that termination of her

parental rights was in J.R.-M.'s best interest was against the manifest weight of the evidence

because the evidence demonstrated that she maintained a positive bond with the minor during the

first year of his life.

¶ 36           "At the best-interest portion of a termination hearing, the State bears the burden of

proving by a preponderance of the evidence that termination of parental rights is in the child's

best interest." *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this stage, "the parent's interest in

maintaining the parent-child relationship must yield to the child's interest in a stable, loving

home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Section 1-3(4.05) of the Juvenile Court Act

(705 ILCS 405/1-3(4.05) (West 2024)) provides that, when a best-interest determination is

required, the trial court must consider several enumerated factors, including: (1) the child's

physical safety and welfare, (2) development of the child's identity, (3) the child's background

and ties, (4) the child's sense of attachments, (5) the child's wishes and long-term goals, (6) the

child's community's ties, (7) the child's need for permanence, (8) the uniqueness of every family

and child, (9) the risks related to being in substitute care, and (10) the preferences of the people

available to care for the child.

¶ 37           We will reverse a trial court's best-interest determination only if it is against the

manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33.

¶ 38           Here, the trial court's determination that termination of respondent's parental

rights was in J.R.-M.'s best interest was not against the manifest weight of the evidence. The

evidence at the best-interest portion of the termination hearing showed that J.R.-M. had been in

the care of his foster parents since he was discharged from the hospital following his birth, and they were willing to adopt him. J.R.-M.'s foster parents were bonded with him, provided for all of his needs, and fostered relationships with his biological siblings. They provided the only home he had ever known. On the other hand, at the time of the hearing, respondent had not visited J.R.-M. for approximately 16 months, and she had made no progress toward his return due to her failure to participate in services.

¶ 39                                             C. Due Process

¶ 40        Respondent also argues that the trial court violated her right to due process by proceeding with the termination hearing in her absence despite her counsel's representation that she was on her way to the courthouse. Respondent asserted that when she arrived later in the hearing, the court "refused to reopen testimony or delay its ruling." The State contends that this argument violates Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) due to respondent's failure to cite the record or any legal authority, other than the general proposition that due process is required for parents in termination hearings.

¶ 41        Rule 341(h)(7) requires that an appellant's brief must contain "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." *Id.* Rule 341(h)(7) further provides that "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." *Id.* "It is a rudimentary rule of appellate practice that an appellant may not make a point merely by stating it without presenting any argument in support." *Housing Authority of Champaign County v. Lyles*, 395 Ill. App. 3d 1036, 1040 (2009). Arguments that are not properly developed do not merit consideration on appeal and may be rejected for that reason alone. *U.S. Bank Trust National Ass'n v. Junior*, 2016 IL App (1st) 152109, ¶ 19.

¶ 42 We agree with the State that respondent's due-process argument violates Rule 341(h)(7). Respondent's argument, which is four sentences long, amounts to no more than conclusory assertions and the reference to the general principle that parents have a right to due process in termination proceedings. The argument also contained no citations to the record. Notably, respondent's assertion that the trial court "refused to reopen the testimony" after she arrived at the hearing appears to be inaccurate, as the transcript shows that she testified during the best-interest portion of the hearing and never requested that the court reopen evidence as to the unfitness portion. Thus, we find respondent has forfeited her due-process argument by failing to properly develop it in compliance with Rule 341(h)(7). See *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010).

¶ 43 III. CONCLUSION

¶ 44 For the reasons stated, we affirm the trial court's judgment.

¶ 45 Affirmed.