NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250966-U

NO. 4-25-0966

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 15, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 23JA131 |
| v. | ) | |
| Shawna F., | ) | Honorable |
| Respondent-Appellant). | ) | John Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Presiding Justice Steigmann and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment terminating respondent's parental rights, finding no meritorious issue could be raised on appeal.

¶ 2   In May 2025, the State filed a petition to terminate the parental rights of respondent, Shawna F., as to her minor child, L.F. (born in August 2022). (L.F.'s father, Michael B., is not a party to this appeal.) In August 2025, the trial court entered an order terminating respondent's parental rights.

¶ 3   Respondent appealed, and counsel was appointed to represent her. Appellate counsel now moves to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *In re S.M.*, 314 Ill. App. 3d 682 (2000). Notice of the motion to withdraw was provided to respondent. She did not file a response. For the reasons that follow, we grant the motion to withdraw and affirm the trial court's judgment.

¶ 4                               I. BACKGROUND

¶ 5                            A. The Neglect Petition

¶ 6        In December 2023, the State filed a petition for adjudication of wardship of L.F., alleging the child was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) due to residing in an environment injurious to his welfare. The petition alleged respondent (1) had unresolved mental health issues, (2) had a history of environmental neglect, housing instability, and cohabitation with a registered sex offender, and (3) failed to respond to L.F. and allowed him to continuously scream without taking care of his basic needs, like feeding or changing a diaper, while in the emergency room. Following a shelter care hearing, the trial court found probable cause to believe L.F. was a neglected minor, determined there was an immediate and urgent necessity to protect L.F., and appointed the Illinois Department of Children and Family Services (DCFS) as temporary custodian.

¶ 7        In February 2024, the trial court adjudicated L.F. neglected. In March 2024, the court entered a dispositional order finding respondent unfit, making L.F. a ward of the court, and placing custody of L.F. with DCFS.

¶ 8                           B. The Termination Petition

¶ 9        In May 2025, the State filed an amended petition for termination of respondent's parental rights to L.F. The petition alleged respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to L.F.'s welfare (750 ILCS 50/1(D)(b) (West 2024)). In August 2025, the trial court held a joint fitness and best interest hearing.

¶ 10                            1. *The Fitness Hearing*

¶ 11       On the State's motion and without objection, the trial court took judicial notice of

the docket and the prior court orders in the case.

¶ 12        Melissa Messenger, a DCFS child welfare specialist, testified she was assigned to L.F.'s case in January 2024. Under the court-ordered service plan, respondent was required to engage in mental health counseling and parenting classes, cooperate with DCFS, and maintain suitable housing and employment. Respondent completed an integrated assessment and the parenting classes. She did not engage in mental health treatment. Respondent missed 29 of the 48 weekly visits. According to the case aide who supervised the visits, respondent's mother was the one who was primarily taking care of L.F. during the visits. After November 2024, respondent ceased visitation and communication with L.F.

¶ 13        On cross-examination, Messenger testified respondent missed visits due to lack of money, lack of transportation, or illness. Respondent usually contacted the visit supervisor when she was unable to attend a scheduled visit. When respondent's car broke down, the agency provided her with transportation. Respondent contacted the agency to reestablish visitation in 2025, but she did not follow up with scheduling a visit. As to housing, respondent had moved from Rantoul, Illinois, to Springfield, Illinois, and later returned to Rantoul. Respondent was employed through the Department of Rehabilitation Services as a part-time live-in caregiver for her mother. Respondent did not acknowledge L.F.'s birthday in August 2024. Messenger explained to respondent on multiple occasions that she needed to engage in mental health counseling, but respondent never followed through with scheduling appointments. Respondent was evicted from her home in Springfield for failing to pay for her utilities. Messenger discussed with respondent ways she could get financial assistance for housing expenses, but respondent never applied for it. Instead, she moved back in with a friend or family member. She did not seek any employment outside of caring for her mother. Messenger agreed that "one of the biggest problems was

[respondent's] lack of follow-through on anything that was requested of her."

¶ 14    Respondent testified at the start of the case, she and her mother were living in Bloomington, Illinois, with her aunt. They moved to Springfield because they did not feel safe and her aunt kicked them out. Respondent and her mother moved in with her father in Springfield, but they moved to Rantoul after respondent had issues with her father. Thereafter, respondent and her mother moved back to Springfield and lived in their own home. Respondent explained she fell over $400 behind on her water bill due to a running toilet that took months to fix. She stated she received assistance through the Low Income Home Energy Assistance Program to pay her gas bill, but it did not have enough funds to help with her water bill. After they were evicted, respondent and her mother moved in with respondent's godparents in Rantoul. Respondent and her mother lived together because respondent has seizures and her mother is disabled.

¶ 15    Respondent claimed she could not get employment outside of caring for her mother due to her epilepsy. She stated she did not miss visits because of money or transportation; rather, she only missed visits because of illness. Respondent asserted that while she let her mother spend time with L.F. during visits, she was the one taking care of and feeding him. Respondent was unable to confirm some of the visits because her phone was shut off or was broken.

¶ 16    Respondent explained she ceased contact with L.F. in November 2024 because she "was afraid that seeing him if [her] rights got terminated was just going to make it worse for him." However, around April or May 2025, respondent reached out to Messenger and a case aide around three or four times to reestablish visitation. Respondent did not send gifts or letters or make phone calls to L.F. because she claimed she did not know if she was allowed to. She stated the visits remained supervised and were never moved to her home during the case's pendency. Respondent testified she brought clothing, diapers, toys, and books to visits with L.F.

- 4 -

¶ 17 The trial court found respondent unfit based on her failure to maintain a reasonable degree of interest, concern, or responsibility as to L.F. The court considered the evidence and testimony presented at the hearing and its prior orders in the case. The court premised its unfitness finding primarily on respondent's visitation. The court noted respondent admitted transportation and finances were not obstacles to visitation. The court found respondent's explanation she missed 29 of the 48 offered visits due to illness unconvincing. Respondent did not visit or contact L.F. for over five months prior to the filing of the termination petition. Respondent could have asked the caseworker about contacting L.F. but chose not to. The court noted respondent also totally failed to engage in mental health counseling.

¶ 18 2. *The Best Interest Hearing*

¶ 19 The trial court immediately proceeded to the best interest portion of the hearing. The court took a brief recess to review the best interest report and the court-appointed special advocate's report. After reconvening, the court took judicial notice of the reports and the entire court file.

¶ 20 Michelle K. testified she was L.F.'s foster mother. L.F. had lived with Michelle, her husband, and their three-year-old son since December 2023. Michelle described L.F. as a fun and energetic boy who loved sports. She stated L.F. had adjusted well, was now a member of the family, and had a strong bond with the entire family. Michelle, together with her husband, loved L.F. and had committed to adopting him by signing permanency commitment forms. She described L.F. and her biological son's relationship as similar to that of twin brothers. Michelle opined it was in L.F.'s best interest to remain in her home, as he had lived with her family since he was 15 months old and they had provided stability, familiarity, and developmental speech therapy to him. She expressed concern with returning L.F. to respondent's care, as respondent moved around often

and lacked permanent housing. Michelle testified L.F. never asked about respondent. She did not observe any significant behavioral issues following visits with respondent.

¶ 21 Respondent testified visits with L.F. always went very well and he referred to her as "Mom" or "Momma." She was unaware of any developmental concerns with L.F. at the time of his removal. Respondent acknowledged she did not currently have suitable housing, but she was attempting to relocate to Dream Center Peoria, a shelter in Peoria, Illinois. She was willing to maintain contact with the foster family if L.F. was returned to her. Respondent stated she wished she had more contact with L.F. throughout the case. She emphasized that L.F. still saw her as his mother. Respondent admitted she had not seen L.F. in nine months.

¶ 22 The trial court found it was in the best interest of L.F. to terminate respondent's parental rights. The court noted respondent did not have contact with L.F. for a significant period. The court further found respondent did not put forth efforts to maintain contact and made unacceptable excuses for her failure to do so. The court acknowledged respondent initially engaged with visitation, but she later made the decision to stop attending visits. Because respondent stopped attending visits, the foster family became the primary influence for the development of L.F.'s identity. The court recognized the background and familial ties factor did not favor termination because L.F. was in an unrelated placement and there was no communication between the foster parents and respondent. The court observed the foster family provided for L.F.'s needs and their home is where he felt secure and safe. The court emphasized L.F.'s attachment to his foster brother. The foster family had committed to permanency through adopting L.F. Based on the foregoing, the court found the foster family would be the least disruptive placement for L.F. The court underscored L.F.'s need for permanency, noting he had been in care for over half of his life. The court found respondent was not in a position to care for L.F., as she struggled to take care of herself

and was already caring for her disabled mother.

¶ 23    This appeal followed.

¶ 24                    II. ANALYSIS

¶ 25    On appeal, appellate counsel moves to withdraw on the basis it would be frivolous to argue the trial court erred in finding (1) respondent unfit and (2) it was in the best interest of L.F. to terminate respondent's parental rights.

¶ 26                    A. Fitness Finding

¶ 27    Counsel argues any argument challenging the trial court's unfitness finding would be without arguable merit.

¶ 28    The involuntary termination of parental rights occurs through a two-stage process as set forth under the Juvenile Court Act. 705 ILCS 405/2-29(2) (West 2024). At the first stage, the State must prove by clear and convincing evidence that the parent is unfit under one or more grounds as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re J.H.*, 2020 IL App (4th) 200150, ¶ 67. If the State proves unfitness, the matter then proceeds to the second stage, where the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re M.I.*, 2016 IL 120232, ¶ 20; *In re D.T.*, 212 Ill. 2d 347, 366 (2004).

¶ 29    Under section 1(D)(b) of the Adoption Act, a parent may be found unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to their child's welfare. 750 ILCS 50/1(D)(b) (West 2024). Because it is stated in the disjunctive, unfitness may be premised on any one element under section 1(D)(b). *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). In examining whether a parent has maintained a reasonable degree of interest, concern, or responsibility, the trial court should consider the parent's efforts to visit the child, efforts to

maintain contact with the child, and inquiries into the child's welfare. *J.H.*, 2020 IL App (4th) 200150, ¶ 72. "If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest[,] and responsibility." *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). The court should focus its inquiry on the parent's efforts to show interest in the child, rather than the success of those efforts. *M.I.*, 2016 IL 120232, ¶ 28.

¶ 30 A trial court's finding of unfitness will not be reversed on appeal unless it is against the manifest weight of the evidence. *J.H.*, 2020 IL App (4th) 200150, ¶ 68. A finding is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 31 Here, respondent missed 29 of the 48 scheduled visits. At the visits she attended, the case aide relayed respondent did not show much interest toward L.F. and left much of his care to his grandmother. Respondent admitted she did not miss visits due to financial or transportation issues but rather attributed all her absences to illness. Even if respondent was sick, she did not try to show interest toward L.F. in other ways, such as letters, phone calls, or gifts. See *M.I.*, 2016 IL 120232, ¶ 36 ("The primary consideration is visitation; other factors demonstrating interest, concern, or responsibility are considered if visitation was impractical."). Respondent testified she did not know if she was allowed to reach out to L.F. or send items to him. However, she also testified that she never asked her caseworker about whether she could contact L.F. in other ways. In November 2024, respondent stopped attending visits altogether. She did not attempt to reestablish visitation until after the termination petition was filed. She also did not acknowledge L.F.'s August 2024 birthday. Further, respondent did not engage in mental health counseling and failed to obtain suitable housing or employment, as she was required to do under the service plan.

See *Jaron Z.*, 348 Ill. App. 3d at 259 ("Noncompliance with an imposed service plan *** [has] been held to be sufficient evidence warranting a finding of unfitness under [section 1(D)(b)].").

¶ 32    Even within the context of her personal circumstances, respondent's failure to maintain regular visitation or contact with L.F., her refusal to participate in mental health counseling, and her inability to obtain suitable housing or employment more than sufficiently demonstrate she has not maintained a reasonable degree of interest, concern, or responsibility as to the welfare of L.F. Accordingly, we agree with appellate counsel that there is no issue of arguable merit to be raised on appeal regarding the trial court's unfitness determination, as it was not against the manifest weight of the evidence.

¶ 33                    B. Best Interest Finding

¶ 34    Counsel next submits no meritorious argument exists that it was not in L.F.'s best interest to terminate respondent's parental rights.

¶ 35    Once a parent is found unfit, the trial court determines whether termination of parental rights is in the best interest of the child. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. In making its best interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). Those factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence,

including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *Jay. H.*, 395 Ill. App. 3d at 1071 (citing 705 ILCS 405/1-3(4.05) (West 2008)).

¶ 36　　"The [trial] court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. We afford great deference to the court's best interest determination, as the court is in the best position to observe the witnesses and judge their credibility. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. A best interest finding will not be disturbed unless it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33.

¶ 37　　Here, the trial court found terminating respondent's parental rights was in L.F.'s best interest, determining his physical safety, development of identity, sense of attachment, and need for permanency all favored L.F. remaining with the foster family. See 705 ILCS 405/1-3(4.05)(a), (b), (d), (g) (West 2024). The court also acknowledged L.F.'s background and familial ties did not favor termination, as his placement was with an unrelated foster family who did not have communication with respondent. See 705 ILCS 405/1-3(4.05)(c) (West 2024). However, evidence showed the foster parents were providing for all L.F.'s needs and had committed to adoption. L.F. was adjusting well to the foster home and had formed an especially strong bond with his foster brother. In contrast, respondent failed to maintain stable housing throughout the case, moving at least five times since L.F. was removed from her care. She struggled to take care of herself and her disabled mother. Moreover, she admitted she had not seen L.F. in the nine

months preceding the hearing.

¶ 38 Our review of the record shows the trial court appropriately weighed the statutory factors under section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). Consequently, we agree with appellate counsel that no meritorious argument could be raised that the trial court's best interest determination was against the manifest weight of the evidence.

¶ 39                                  III. CONCLUSION

¶ 40 For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 41 Affirmed.