NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251105-U

NO. 4-25-1105

IN THE APPELLATE COURT

FILED
February 19, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* J.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Logan County |
| Petitioner-Appellee, | ) | No. 24JA23 |
| v. | ) | |
| Amanda M., | ) | Honorable |
| Respondent-Appellant). | ) | Jonathan C. Wright, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed the trial court's judgment terminating respondent's parental rights, as the court's finding that termination was in the best interests of the minor was not against the manifest weight of the evidence.

¶ 2    Respondent, Amanda M., appeals from the trial court's judgment terminating her parental rights as to her minor child, J.P. (born in 2024). On appeal, respondent argues that the court erred in finding that it was in the best interests of the minor to terminate her parental rights. For the following reasons, we affirm the court's judgment.

¶ 3                                I. BACKGROUND

¶ 4    On July 1, 2024, approximately two weeks after J.P.'s birth, the State filed a petition for adjudication of wardship as to J.P., alleging that he was neglected in that his cord blood tested positive for methamphetamine (705 ILCS 405/2-3(1)(c) (West 2024)). On the same day, the trial court found that probable cause for the petition existed and there was an immediate and urgent

need to remove the minor from the home. The court granted temporary custody of J.P. to the Illinois Department of Children and Family Services (DCFS).

¶ 5        On August 16, 2024, the trial court entered an adjudicatory order finding that J.P. was neglected in that he was exposed to illicit drugs as a newborn (705 ILCS 405/2-3(1)(c) (West 2024)). Neither parent was able to be served summons due to their addresses being unknown, so both parents were served by publication; the father appeared at the adjudicatory hearing, while respondent did not. On November 13, 2024, the court entered a dispositional order finding both parents unable to care for J.P. and making J.P. a ward of the court.

¶ 6        The trial court held a status hearing on January 16, 2025. Respondent was in custody at the Logan County jail at that time and apparently refused to come to court or appear in the video room. The court held a subsequent permanency hearing on April 10, 2025, where respondent appeared for the first time. Because she requested an attorney, the court continued the permanency hearing to a later date.

¶ 7        On May 23, 2025, the State filed a petition to terminate respondent's parental rights as to J.P., alleging that she was depraved (750 ILCS 50/1(D)(i) (West 2024)), failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during the nine-month period between August 17, 2024, and May 17, 2025 (750 ILCS 50/1(D)(m)(i) (West 2024)), failed to make reasonable progress toward the return of the child to the parent during the same nine-month period (750 ILCS 50/1(D)(m)(ii) (West 2024)), and has been repeatedly incarcerated as a result of criminal convictions, which has prevented her from discharging her parental responsibilities (750 ILCS 50/1(D)(s) (West 2024)).

¶ 8        The trial court held a permanency hearing on May 29, 2025, and subsequently entered a permanency order finding that respondent had made reasonable efforts but not reasonable

progress toward returning the minor home.

¶ 9        The trial court held a hearing on the termination petition on August 14, 2025. The father voluntarily surrendered his parental rights. The court proceeded to a hearing on the petition as to respondent's fitness. The State indicated it would only be proceeding on the allegations of depravity (750 ILCS 50/1(D)(i) (West 2024)) and repeated incarceration (750 ILCS 50/1(D)(s) (West 2024)). The following evidence was presented.

¶ 10       Bailey Volle was the DCFS caseworker assigned to J.P.'s case as of November 2024. When Volle first met respondent, she was incarcerated in the Logan County jail; she was later transferred to the state prison in Decatur, Illinois, where she remained at the time of the hearing. Volle met with respondent in person and telephonically while respondent was incarcerated. Volle testified that while incarcerated, respondent had completed parenting and life skills classes and was currently enrolled in other classes. Respondent's parole date was set for June 21, 2027, but she had indicated she may be released as early as December 2025.

¶ 11       On the State's request and without objection, the trial court admitted several certified convictions into evidence. These exhibits showed that respondent had several drug-related convictions in the previous six years. On March 10, 2025, respondent was convicted of possession of methamphetamine (a Class 3 felony) and sentenced to three years in prison. On November 26, 2024, respondent was convicted of unlawful delivery of a controlled substance (a Class 2 felony) and aggravated identity theft (a Class 3 felony) and was sentenced to six years in prison. On January 29, 2019, she was convicted of aggravated identity theft (a Class 3 felony), unlawful possession of methamphetamine (a Class 3 felony), and unlawful delivery of methamphetamine (a Class 2 felony) and sentenced to 12 years in prison.

¶ 12       Respondent testified that she had been incarcerated since August 22, 2024. She

believed that because she had been taking classes and completing certificates while incarcerated, she would be released as early as December 2025. She testified that she completed classes in parenting, life skills, grief and loss, problem solving skills, leadership, "job seeking safety," "drug solving problem," and "[h]ouses of healing and drug awareness." She was also taking classes at Lakeland College in Decatur and working as an academic porter within the prison. She testified that she had taken all classes offered to her. She acknowledged she had other criminal convictions in addition to those five reflected in the State's exhibits. She also acknowledged that she had taken classes during her prior incarcerations. However, she explained that she did not previously complete the drug classes because she "went to work release instead of completing classes." She testified that, unlike her prior incarcerations, her "focus this time was getting drug treatment and just really trying to find [her]self" and taking "advantage of all the opportunity of all the programs that [she] could."

¶ 13    The trial court found that the State did not prove that respondent was depraved but did prove that respondent was unfit because she had been repeatedly incarcerated and her incarceration prevented her from discharging her parental responsibilities. The court noted that J.P. was born in June 2024 and respondent was incarcerated shortly thereafter. According to the court, respondent was only in J.P.'s life for about two months and had not since "been in a position to provide home, meals, medical attention, or care or educational care to this child."

¶ 14    The trial court proceeded to a best-interests hearing on October 16, 2025. The following evidence was presented.

¶ 15    The State first introduced, without objection, exhibits consisting of the father's death certificate and respondent's current Illinois Department of Corrections (IDOC) inmate status. At the State's request, the trial court took judicial notice of the best-interests report, as well

as the testimony and evidence presented at the fitness hearing.

¶ 16    The best-interests report, prepared by Volle, indicated that J.P. was one year old and had resided with his paternal grandparents, who were willing to adopt him, since August 15, 2024. His paternal grandparents had adopted his paternal cousin. J.P. had some potential ongoing medical issues, for which he saw a primary care doctor and a pediatric neurologist. In April 2025, J.P. and respondent began having visitation in prison twice monthly for four hours. The best-interests report opined that J.P. was bonded with his foster parents, who provided a safe, stable, and loving family and advocated for his medical and emotional needs, while J.P. lacked a bond with respondent.

¶ 17    Respondent testified that although her official release date was now April 2, 2027, she believed she would be released on January 8, 2026. She explained that she entered a program called WestCare, which would give her additional time off her sentence and move up her projected parole date. She was enrolled in the "dual diagnosis substance abuse treatment program," which was a level 2 intensive outpatient substance abuse program. At respondent's request and without objection, the trial court admitted exhibits consisting of nine certificates from classes respondent had completed while incarcerated. Respondent believed these classes would help her reintegrate into society and parent her child upon her release from prison. She testified that she participated in visitation with J.P. every other Friday for four hours, had started to bond more with him, and enjoyed her time with him. She stated that she was in a program called "mommy and me" and was preparing to interview with "Crossings," which was an organization that would provide her assistance with housing, employment, counseling, healthcare, and day care as long as she was working toward reunification with J.P. She could stay with that program for up to a year.

¶ 18    Respondent acknowledged that she had prior issues with substance abuse that had

repeatedly led to her incarceration. However, she testified that on prior occasions, she was never given the opportunity to work on getting J.P.'s two older siblings returned to her, as her previous 12-year sentence was so long that she had to surrender her parental rights to those children.

¶ 19    Respondent acknowledged that she had 10 separate felony cases between 2009 and 2024. She stated that she was offered the chance to participate in drug court, but she was ultimately unsuccessful. She was offered services such as substance abuse and parenting classes but ended up being sentenced to prison again. However, she stated that when she was released on prior occasions, "I come back and I do the same thing and I hang out with the same people doing the same thing, expecting *** different results." She testified that this time would be different because of the "Crossings" program, where she would be "around other moms with the same problem, working towards the same goals, trying to be successful." She explained that she had learned that she "can't rely on anybody but [her]self" and she had to "change everything, just not one thing." She stated that J.P. was "all [she] ha[d] left" and he was "worth fighting for," as he was her "only child that [she has] any hope to raise and be a mother to."

¶ 20    Respondent testified that J.P.'s father committed suicide on August 1, 2025. She explained that this gave her "more motive to do better" and "[t]o do right" by J.P. Respondent stated,

> "I know I have failed and failed. And I've had many incarcerations and struggled with drugs. But I'm 40 years old and I just want the opportunity to raise my son. This is my last opportunity that I'm going to be able to be a mother.
>
> I just want to show you that [I] can stay clean and that I can be a mother and do the right thing and not live the life that I was living, because it's not going to get me anywhere."

¶ 21　　　　The trial court ultimately found that it was in J.P.'s best interests to terminate respondent's parental rights. The court highlighted several factors it found particularly salient. Respondent had availed herself of many services while in prison. However, she remained in custody. Her projected release date was April 2, 2027, though it could be as soon as January 8, 2026. In the meantime, she was unable to provide for J.P.'s safety and welfare. J.P. had been placed with his paternal grandparents since August 2024, which is where his identity and sense of attachment were and which would be the least disruptive placement. Even if the court denied the petition and assumed respondent would be released in January 2026, given that J.P. lacked a strong bond with her, it would take many weekly, overnight, and weekend visits to build their bond back up, and May or June 2026 would be the soonest that respondent could regain custody of J.P. Respondent would have to prove that she was able to implement what she learned in her classes and take care of J.P. once she had been released. As a result, the court found it would be in J.P.'s best interests for respondent's parental rights to be terminated.

¶ 22　　　　This appeal followed.

¶ 23　　　　　　　　　　　　　　　II. ANALYSIS

¶ 24　　　　On appeal, respondent argues that the trial court's best-interests finding was against the manifest weight of the evidence. She does not challenge the unfitness finding.

¶ 25　　　　The involuntary termination of parental rights involves a two-step process pursuant to section 2-29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2024)). The State must first prove by clear and convincing evidence that the respondent is unfit. *In re C.M.*, 305 Ill. App. 3d 154, 163 (1999). If a parent is found to be unfit, the State must then prove that terminating parental rights is in the minor's best interests. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this step, the focus shifts from the parent to the child. See *In re D.T.*, 212 Ill. 2d 347, 364

(2004) ("[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life."). The burden on the State at the best-interests hearing is a preponderance of the evidence. *D.T.*, 212 Ill. 2d at 366.

¶ 26 When determining a minor's best interests, the trial court must consider the following factors,

"in the context of the child's age and developmental needs:

(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals ***;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and

- 8 -

other relatives;

> (h) the uniqueness of every family and child;

> (i) the risks attendant to entering and being in substitute care; and

> (j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2024).

¶ 27 The trial court's best-interests determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We afford great deference to the court's determination, as it is in the best position to view the witnesses and judge their credibility. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71.

¶ 28 In this case, the trial court's best-interests finding was not against the manifest weight of the evidence. Given respondent's incarceration, she could not provide J.P. with physical safety and welfare. See 705 ILCS 405/1-3(4.05)(a) (West 2024). Although respondent anticipates being released from prison earlier, we note that the IDOC website indicates, as of February 2026, that she is still in custody, with a projected parole date of December 7, 2026. See *Cordrey v. Prisoner Review Board*, 2014 IL 117155, ¶ 12 n.3 ("This court may take judicial notice of [IDOC] records because they are public documents."). Regardless of when respondent is ultimately released from prison, the court was correct that it would take months or even years to rebuild the bond between J.P. and respondent and for respondent to adequately demonstrate to the court that she was able to implement the lessons she learned in her classes and provide J.P. with the safe home environment he needed. He had been placed with his paternal grandparents for all but two months of his life, so that placement is where he was developing his identity, had familial bonds, had a sense of attachment, security, familiarity, and affection, and would have the least disruptive placement. See 705 ILCS 405/1-3(4.05)(b), (c), (d) (West 2024). The court properly emphasized

J.P.'s need for permanence over the future chance of reuniting with respondent. See 705 ILCS 405/1-3(4.05)(g) (West 2024). His paternal grandparents expressed their willingness to provide that permanence. See 705 ILCS 405/1-3(4.05)(j) (West 2024). The record shows that respondent cares about J.P.; however, "at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. Here, considering all these statutory factors, the court's conclusion that terminating respondent's parental rights was in the minor's best interests was not against the manifest weight of the evidence.

¶ 29                                III. CONCLUSION

¶ 30          For the reasons stated, we affirm the trial court's judgment.

¶ 31          Affirmed.