# Illinois Official Reports

## Appellate Court

---

### *In re J.B.*, 2019 IL App (4th) 190537

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.B., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Nicholas B., Respondent-Appellant). |
| District & No. | Fourth District<br>No. 4-19-0537 |
| Filed | December 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 17-JA-42; the Hon. Brett N. Olmstead, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John B. Hensley, of Champaign, for appellant.<br><br>Julia Rietz, State's Attorney, of Urbana (Patrick Delfino and David J. Robinson, of State's Attorneys Appellate Prosecutor's Office, of counsel, and Brittany J. Whitfield, law school graduate), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Turner and Cavanagh concurred in the judgment and opinion. |

**OPINION**

¶ 1     Respondent, Nicholas B., is the father of J.B. (born November 2015) and S.C. (born July 2013). In May 2019, the trial court found respondent was an unfit parent, and in July 2019, it found termination of respondent's parental rights would be in the minors' best interest. Respondent appeals, arguing that the trial court's best-interest determination was against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 2                                 I. BACKGROUND

¶ 3                      A. The Petition for Adjudication of Wardship

¶ 4     In July 2017, the State filed a petition for adjudication of wardship against respondent and Karen B., respondent's wife and mother of the minor children, alleging J.B. and S.C. were neglected minors as defined by the Juvenile Court Act of 1987 (Act) due to their being minors less than 18 years of age whose environment is injurious to their welfare when they reside with their parents because that environment exposes them to domestic violence. 705 ILCS 405/2-3(1)(b) (West 2016).

¶ 5     At the October 2017 adjudicatory hearing, Karen and respondent stipulated to the allegations in the petition. The State offered a police report as a factual basis to support the stipulation. The report indicated that in July 2017, Karen and respondent got into an argument during which Karen threatened to "slit her wrists" and respondent (1) slammed her into walls, (2) pointed a gun toward himself and asked her to shoot him, and (3) threatened to shoot himself. The report indicated that all these events took place in front of the minor children. The court found that the police report provided a factual basis for the stipulation, accepted the stipulation, and found the minors were neglected.

¶ 6     Later that month, the trial court conducted a dispositional hearing. Following that hearing, the court entered a written order in which it (1) found that it was in the best interest of the minor children and the public that they be made wards of the court and (2) adjudicated the children to be neglected minors. The court also found that (1) Karen was fit, able, and willing to exercise custody of the minors and (2) her retaining custody would not "endanger the minors['] health o[r] safety and is in the best interest of the *** minors." The court further found that respondent "so far has not been fully cooperative with DCFS in their efforts to gather information to help address [his problems]." Accordingly, the court found respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, or discipline the minors, and the court further concluded that it would be contrary to the minors' health, safety, and best interest to be in his custody.

¶ 7     The trial court ordered that (1) guardianship of the children be placed with the guardianship administrator of the Department of Children and Family Services (DCFS) and (2) their custody be removed from respondent. The order also admonished the respondent parents that "if they fail to correct the conditions which required the children to be in care by completing the service plans, cooperating with any after-care plan[,] and complying with the terms of this order, they risk loss of custody and termination of parental rights."

¶ 8                                    B. The Termination Hearing

¶ 9        In February 2019, the State filed a motion for termination of respondent's parental rights. The State alleged respondent was an unfit parent because he (1) failed to make reasonable progress toward the return of the minor children within the nine-month period between May 2018 and February 2019 and (2) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare. 750 ILCS 50/1(D)(b), (D)(m)(ii) (West 2018). The petition did not include Karen.

¶ 10                                    1. *The Fitness Proceedings*

¶ 11       In May 2019, the trial court conducted the fitness portion of the termination hearing to address respondent's parental fitness. Tracy Vincent testified that she was the supervisor of the DCFS caseworkers assigned to the case, and she had been working in that capacity since DCFS received the case in October 2017. Vincent stated that she had met or spoken with respondent between 10 and 12 times and respondent "was found to be in need of anger management, domestic violence services, a mental health assessment, anticipated counseling after the mental health assessment, [and] supervised visits."

¶ 12       Vincent explained that on numerous occasions she and other DCFS personnel had informed respondent of the need to complete these services and had offered him several different referral options to do so. However, respondent refused to participate in any of the services, indicating that he would do things only through Veteran Affairs (VA) because he believed they were the only ones qualified to work with him due to his combat post-traumatic stress disorder (PTSD), and he "did not trust any other services." (We note that the record indicates respondent is an army veteran who served in Afghanistan.) Vincent contacted respondent's counselor at the VA to see what services they could provide. However, respondent revoked his consent for the VA to share information with DCFS, and Vincent was unable to find out if respondent ever received services from the VA.

¶ 13       Vincent testified that although, throughout the life of the case, she repeatedly attempted to engage respondent in services, he refused to cooperate. He would often yell at her over the phone and hang up on her. Vincent stated respondent told her the only way he would participate was "if DCFS gave him a formal and written apology for perjuring themselves and providing the Court with lies about him."

¶ 14       Respondent visited the minor children only twice, once on Christmas in 2017 and another time in early 2018, despite being allowed to have third-party supervised visits. Respondent identified only his parents, who lived in Indiana, as persons who could provide the necessary supervision.

¶ 15       Vincent stated respondent never sent the children cards, gifts, or letters and, as far as she knew, never had contact with them other than the two visits. Vincent said respondent never asked about the children and would cut her off or hang up on her when she tried to talk to him about them.

¶ 16       Vincent further testified that respondent did not participate in any services during the nine-month period between May 2018 and February 2019. Vincent could not refer him for any services during that period because respondent "refused to sign any consents of release of information and he refused to cooperate with any service." Vincent stated she did not know where respondent lived because he did not provide an address. During a phone conversation in

June 2018, respondent told her he lived "over a thousand miles away" and refused to leave an address.

¶ 17    Respondent did not appear at the fitness portion of the termination hearing, although his counsel did. Respondent had filed a motion prior to the hearing to participate by phone, but the trial court denied it. The court stated that respondent had not provided a satisfactory explanation for why he could not be present. (We note that counsel for Karen argued the State had met its burden and demonstrated respondent was unfit.)

¶ 18    At the conclusion of the hearing, the trial court found the State had proved by clear and convincing evidence that respondent (1) failed to make reasonable progress and (2) failed to maintain a reasonable degree of interest or concern. Regarding progress, the court emphasized respondent's complete lack of cooperation with DCFS and refusal to engage in services. Further, respondent had absented himself from the state and from the proceedings.

¶ 19    Regarding maintaining a reasonable degree of interest, the court noted that respondent visited his children just twice during the entirety of the case and never contacted them or sent them letters, cards, or gifts. The court also noted it had considered respondent's combat PTSD but nothing in the limited information before the court indicated respondent's condition prevented him from having contact with his children. Accordingly, the court found respondent was an unfit parent.

¶ 20                              2. *The Best-Interest Proceedings*

¶ 21    In May 2019, the trial court conducted the best-interest portion of the termination hearing to determine whether it was in the minor children's best interest to terminate respondent's parental rights. Again, respondent appeared through counsel but not personally.

¶ 22    The State argued it was in the minor children's best interest that respondent's parental rights be terminated and noted that (1) the children were doing well living with their mother, (2) respondent had removed himself from their lives and had no contact with them for years, and (3) terminating respondent's parental rights was needed to provide the children stability and to maintain their lives without disruption from respondent.

¶ 23    Respondent argued it was not necessary to terminate his parental rights because the children had returned to their mother, a development that he supported, and if the trial court did not terminate his rights, respondent might be able to change in the future and provide the children with "two fit, able, and willing parents." At the hearing, Karen took no position.

¶ 24    The trial court recognized that Karen was doing very well and would likely have the custody and guardianship of the children returned to her, and if the court did not terminate respondent's parental rights, she and the children would be on their own "to then manage [respondent.]" However, the court continued, as follows:

> "That—that sometimes, and frankly often, can be the best situation for a child where that child can maintain a relationship with that biological father, while at the same time having a fit, able, and willing parent who's there, and able to manage that contact and that relationship in a safe way, and then the relationship with the other parent, who remains unfit, it's just—it is what it is. It can often be that that's the right thing to do. That is not the right thing to do in this case."

¶ 25    The trial court found that respondent "was a serious danger in this family, a danger to [Karen], a danger to the children." The court explained that the testimony and reports in the

case showed respondent had been "unwilling to make changes to conditions in his life [and] that make[s] him extremely dangerous for the children." Respondent "removed himself from their lives and has played no part in their lives for a long, long time." Respondent was in another state and had never cooperated with DCFS. The court explained that "what the court would want to wait for is for him to make the changes in his life so that he's not a danger here. He's never done that."

¶ 26 The trial court then discussed how the factors listed in the Act (705 ILCS 405/1-3(4.05) (West 2018)) applied to this case, stating as follows:

"So, he's not been in a position to—or supply a physical, physically safe environment for the children, provide for their welfare, including food, shelter, health, and clothing. He's just—he's not—not only is he not in that position, he is a danger to these children.

It's been a long time since he had anything to do with the development of the children's identity, and you can see the deterioration of that relationship in the materials. The CASA report notes that [S.C.] has actually said she doesn't want to see him. And then just doesn't speak about him at all. He—he's fading away for them, as a part of their lives, by his own choice. And so as they've grown, they're—they're developing an identity, it just doesn't include him.

[Karen] can provide and maintain a continuity for background and ties, the children's sense of attachments and where they feel love and attachment, and a sense of being valued, which they do not feel right now from [respondent], and that's by his own choice.

He does not provide them with security or a sense of familiarity, he hasn't for a long time. He hasn't provided them affection, and so it's not a—a loss of continuity of affection to terminate his parental rights. And the least disruptive placement alternative is where they are right now, [with Karen]. That's the relationship they've maintained. It's not with [respondent]. And there's no indication that [Karen and respondent] are going to, at some time in the future, reunite. In fact, all the indication is the opposite of that, that [Karen] is trying to keep him at a distance, has maintained a separate household for a long time. Has really worked hard and struggled to establish herself independently, not—not just from a practical matter, financial and otherwise, but also emotionally.

It's been a long road for her to separate herself from that unhealthy relationship and situation, and she's done a tremendous amount[ ] of work. [Respondent] has no positive role to play in that whatsoever. In fact, he's an extreme negative.

The children's wishes and long-term goals, I've talked about that. [J.B.] doesn't talk about him, [S.C.] doesn't want to see him. The community ties that they have and a need for permanence. That's with [Karen], and [Karen] does not mean [Karen] and [respondent], [Karen] means [Karen]. [Respondent] has nothing positive to offer that home, that family, that situation. Instead, it's an extreme negative and danger.

They're not in substitute care. And I am considering the uniqueness of every family and child. And this family is unique, and that is an unusual situation for the termination of parental rights to be in the best interests of the children for one biological parent and not the other.

This is that situation, largely if not wholly because of [respondent's] lack of investment in making the changes he would need to make to not be a danger to this family. He's not willing to do that, and I'm not going to keep that kind of danger circling this family at whatever distance [respondent], at any given moment, feels is appropriate.

I find by a preponderance of the evidence and by clear and convincing evidence that it's in the best interests of these children and the public that [respondent] have all residual, natural parental rights terminated as to both children, and that both children be relieved of all obligations of obedience and maintenance with respect to him. The guardianship administrator of DCFS is continued as guardian for now. But all residual natural parental rights and responsibilities of [respondent] are hereby terminated, and the children are relieved of all obligations of obedience and maintenance with respect to him."

¶ 27       This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29       Respondent appeals, arguing that the trial court's best-interest determination was against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 30                        A. The Applicable Law and Standard of Review

¶ 31       At the best-interest portion of a termination hearing, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). "Once the trial court finds the parent unfit, the parent's rights are no longer of concern. The parent's rights must yield to the best interest of the child." *In re Veronica J.*, 371 Ill. App. 3d 822, 831, 867 N.E.2d 1134, 1142 (2007). "Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004).

¶ 32       In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.2d 123, 141 (2006).

See also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 33       A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *In re Jay. H.*, 395 Ill. App. 3d at 1070. An appellate court "will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence." *Id.* at 1071.

A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result. *Id.*

¶ 34                                    B. This Case

¶ 35      We conclude that the trial court's finding was not against the manifest weight of the evidence. The court appropriately concluded that not terminating respondent's parental rights would be detrimental to the children. The court explained it would not permit the children to remain under a cloud of uncertainty regarding respondent's presence in their life. The court noted that Karen was doing better and took a long time to become independent from respondent. Regardless of whether Karen and respondent were married or whether she intended to divorce him, the court recognized that their separation was beneficial for both Karen and the children. To permit respondent's parental rights to continue in the hope that he will decide to begin engaging in services at some later date based on the mere fact that Karen had not yet chosen to divorce respondent would be tantamount to depriving the children of "the child[ren's] need for permanence which includes the child[ren's] need for stability and continuity of relationships with parent figures." 705 ILCS 405/1-3(4.05)(g) (West 2018). In essence, doing so would be forcing them to perpetually wonder if respondent would suddenly reappear and attempt to be a part of their lives. Accordingly, we conclude that the trial court's finding that it was in the minor children's best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 36      In reaching this conclusion, we have considered—and rejected—respondent's arguments as to why the trial court erred by terminating his parental rights. First, respondent argues he had mental health issues related to his military service and those issues prevented him from either accepting services or presenting his problems to the trial court. We recognize that respondent may very well have difficulties relating to his combat PTSD. However, the trial court took respondent's contention into consideration and determined that any of his difficulties did not excuse his lack of compliance. Indeed, the court noted that, without treatment, respondent constituted a danger to the children and Karen.

¶ 37      Respondent next asserts that termination is not necessary because no other person has expressed interest in adopting the children and, as of the most recent permanency hearing, the children are living with Karen. Although "the current availability of an adoptive home is one [important] consideration[ ]" in the best-interest determination, this court has observed that "[i]t may be just as important to free children from continued involvement with a [parent] whose chaotic and disruptive lifestyle is a detriment to their welfare." *In re B.S.*, 317 Ill. App. 3d 650, 665, 740 N.E.2d 404, 416 (2000), *rev'd on other grounds by*, *In re R.C.*, 195 Ill. 2d 291, 304, 745 N.E.2d 1233, 1241 (2001). " '[T]he child[ren's] interest in a loving, stable[,] and safe home environment' might best be served by 'freeing [them] for adoption,' even if no one had offered, as of yet, to adopt them." *In re F.P.*, 2014 IL App (4th) 140360, ¶ 92, 19 N.E.3d 227 (quoting *In re D.T.*, 212 Ill. 2d at 363-64). Accordingly, trial courts have "properly concluded that the children's need for a long-term, stable relationship outweighed the necessity of [there being] an available adoptive home immediately upon termination of respondent's parental rights." *In re D.M.*, 336 Ill. App. 3d 766, 775, 784 N.E.2d 304, 312 (2002). The trial court's findings in this case demonstrate that the children's interest in a safe, stable home life was of paramount importance to the court's determination.

¶ 38    Moreover, this court has explained that "[the fact] that one parent has not been (and may never be) found unfit is merely one additional factor [to] which the trial court may give whatever weight it believes appropriate when it is deciding *** whether it is in the best interest of the child that the parental rights of the first parent be terminated." *In re S.M.*, 219 Ill. App. 3d 269, 277, 579 N.E.2d 1157, 1163 (1991); see also *In re Sims*, 30 Ill. App. 3d 406, 412, 332 N.E.2d 36, 40 (1975) ("The termination of parental rights of one parent is usually a matter separate and apart from and not contingent upon the termination of these rights of the other parent."); *In re S.J.*, 233 Ill. App. 3d 88, 122, 598 N.E.2d 456, 478 (1992) ("A court may terminate the parental rights of one parent while preserving those of the other parent."). The Illinois Appellate Court has repeatedly rejected arguments from parents that termination of their rights is "unnecessary" because the other parent provides permanence. *In re S.J.*, 233 Ill. App. 3d at 122; *In re L.B.*, 2015 IL App (3d) 150023, ¶¶ 16-17, 36 N.E.3d 260; *F.P.*, 2014 IL App (4th) 140360, ¶¶ 92-93.

¶ 39    Nonetheless, respondent argues that his situation is unique. He asserts that respondent and Karen "remain married, and apparently neither has initiated divorce proceedings." Taken together with his PTSD, the lack of adoption, and Karen's parental fitness, respondent argues "there is no urgent need to terminate [respondent's] parental rights, and, conversely, there is time for [respondent] to engage in services and for a rapprochement between him and DCFS." We disagree.

¶ 40    The trial court made clear that Karen and the children needed stability and freedom from the danger presented by respondent. The court explained that Karen had done "tremendous amounts of work" to separate herself from respondent and establish herself independently, both in a practical, financial sense and in an emotional sense. We note that the State filed a petition for adjudication of wardship in response to a severe incident of domestic violence that occurred in front of the children. The court recognized that respondent was "an extreme negative" to Karen's progress of providing a stable, safe, and loving home for the children.

¶ 41    Leaving respondent's parental rights intact could only be a burden to Karen in the future, if not an actual hindrance in further progress, by permitting him to have some measure of input or control over what happens to the children and would risk his reappearing in their lives, either for visitation or through other forms of communication. By terminating his parental rights, the trial court removed respondent from the equation entirely. In essence, the court gave Karen and the children a fresh start and a clean slate because the court removed respondent from their lives.

¶ 42    We agree with the trial court's assessment that this case is unusual in that it is rare that the parental rights of one parent are terminated and the parental rights of the other parent are not, particularly when the parents remain married. However, we see no reason why the parent's marital status should play any role in the trial court's determination of whether termination is in the child's best interest.

¶ 43    Marital status is only relevant to the best-interest proceedings insofar as it affects the children, who are the focus of the proceedings. Here, although Karen and respondent remained married, they separated immediately after the domestic violence incident that precipitated the case. Both respondent and Karen changed residencies, and Karen (eventually) stopped speaking to him entirely. We are unable to see how their marital status affects the minor children. Given that Karen and respondent are completely separated and no longer have contact, the fact that they are married amounts to nothing more than a legal relationship solely

between them. That relationship gives respondent no rights relating to the children because respondent's parental rights have now been terminated.

¶ 44      We thank the trial court for its careful consideration of the unique circumstances of this case and its detailed discussion of the best-interest factors, which this court found particularly helpful to the resolution of this case.

¶ 45                                  III. CONCLUSION

¶ 46      For the reasons stated, we affirm the trial court's judgment.

¶ 47      Affirmed.