NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251094-U

NOS. 4-25-1094, 4-25-1095 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 19, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.C. and N.C., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
|     Petitioner-Appellee, | ) | Nos. 22JA129 |
|     v. | ) |     23JA144 |
| Osvaldo C., | ) | |
|     Respondent-Appellant). | ) | Honorable |
| | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed the trial court's judgment terminating respondent's parental rights, as the court's finding that termination was in the best interests of the minors was not against the manifest weight of the evidence.

¶ 2    Respondent, Osvaldo C., appeals from the trial court's judgment terminating his parental rights as to his minor children, M.C. (born in 2022) and N.C. (born in 2023). On appeal, respondent argues that the court erred in finding that it was in the best interests of the children to terminate his parental rights. The minors' mother is not a party to this appeal. For the following reasons, we affirm the court's judgment.

¶ 3                I. BACKGROUND

¶ 4    The State filed a shelter care petition as to M.C. in June 2022, approximately two weeks after she was born, alleging in two counts that she was neglected in that her environment

was injurious to her welfare where her cord blood tested positive for cocaine (705 ILCS 405/2-3(1)(b), (c) (West 2022)). Respondent acknowledged his paternity of M.C. The trial court found that there was an immediate and urgent need to remove M.C. from the home and granted temporary custody to the Illinois Department of Children and Family Services (DCFS). On July 12, 2022, respondent stipulated to both counts of the petition. In August 2022, the court entered adjudicatory and dispositional orders finding that M.C. was neglected in that she was in an environment injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2022)) and her parents were unfit to care for her. The court ordered respondent to complete a substance abuse assessment and parenting class, engage in counseling, and submit to random drug testing twice monthly. The court entered a permanency order in February 2023, finding that respondent remained unfit and made "mixed" efforts and "no" progress toward a return home. The court entered another order in July 2023, finding that respondent "made efforts and not reasonable progress toward return home."

¶ 5        In August 2023, the State filed a shelter care petition as to N.C. a few days following her birth, alleging that she was neglected in that her environment was injurious to her welfare where her parents were found unfit in M.C.'s juvenile case and there was no subsequent finding of fitness (705 ILCS 405/2-3(1)(b) (West 2022)). The trial court entered an order granting temporary custody of N.C. to DCFS. Respondent admitted the allegations of the petition. On August 29, 2023, the court entered adjudicatory and dispositional orders finding N.C. neglected (705 ILCS 405/2-3(1)(b) West 2022)) and her parents unfit and making N.C. a ward of the court.

¶ 6        The trial court entered several permanency orders over the next year. In December 2023, the court found both parents fit, as they made reasonable efforts and progress toward the children returning home. In July 2024, the court found that the mother was fit but respondent was unfit and had not made reasonable efforts or progress toward the children returning home. In

October 2024, the court found that both parents were unfit and had not made reasonable efforts or progress.

¶ 7 On October 16, 2024, the State filed petitions for termination of parental rights as to both M.C. and N.C. The State alleged that respondent was unfit for failure to make reasonable progress toward the return of the minors to his care within nine months of the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2024)). The nine-month period alleged was November 28, 2023, to August 28, 2024. On April 29, 2025, respondent filed an answer to the termination petition, stating that he "neither admits or denies the allegations" in the count against him "but stipulates the allegations could be proven to the applicable standard of proof." He added that he "denies it is in the best interest of children to terminate his parental rights."

¶ 8 The trial court held a hearing on the termination petition on April 29, 2025. Respondent's counsel first noted that respondent "would be stipulating as to the petition to terminate parental rights, but denying as to the best interest hearing." The court explained to respondent that his stipulation would result in his waiver of his right to deny the allegations and proceed to an evidentiary hearing. Respondent confirmed that he was not being forced or threatened to enter the stipulation, was doing so of his own free will, was not under the influence of any drugs, alcohol, and medications, understood the consequences of the stipulation, and had enough time to discuss the matter with his attorney. The court found that respondent's stipulation as to his parental unfitness was knowingly and voluntarily made. However, the court proceeded to hold an unfitness hearing anyway, as the minors' mother did not stipulate to her own unfitness. The following evidence was presented.

¶ 9 Respondent was arrested on December 28, 2023, after he grabbed the minors' mother by the neck, grabbed her arm, and pushed her up against a wall. He pleaded guilty to the

resulting charge of domestic battery and was sentenced to 12 months of probation. The mother petitioned for an order of protection against respondent, which was granted on February 14, 2024. She repeatedly informed her caseworker that she did not have any contact with respondent. Her children were returned to her between April 24, 2024, and August 1, 2024. However, at that time, the caseworker discovered that the mother and respondent were continuing to have contact with each other and found a video of the two of them drinking alcohol at a party. The mother admitted that she acted contrary to the order of protection. She requested the children be placed with respondent's family, but the caseworker informed her that would not happen, as respondent's family knew that the parents had been communicating.

¶ 10　　　　Respondent was also ordered to complete drug drops during the applicable nine-month period but only completed 2 out of 20, and both were positive for tetrahydrocannabinol. He did not have stable housing. He completed parenting classes in 2022, anger management classes in November 2023, and counseling in December 2023, prior to the domestic violence incident between him and the mother. He was referred to domestic violence counseling in early 2024 but was terminated in March 2024 for failing to attend.

¶ 11　　　　After the close of the evidence, the State asked the trial court to find that there was a sufficient factual basis for respondent's stipulation based on the testimony and exhibits presented. The court found that a factual basis existed and the State could prove by clear and convincing evidence that respondent failed to make reasonable progress toward the return of the children between November 28, 2023, and August 28, 2024.

¶ 12　　　　The trial court then proceeded to a best-interests hearing as to both parents. The following evidence was presented.

¶ 13　　　　Susana Steinberger, a caseworker at Lutheran Social Services of Illinois, was

assigned to M.C.'s and N.C.'s cases between October 16, 2024, and April 3, 2025. She testified that N.C. had been in her current foster home placement since August 1, 2024, and M.C. joined her there on November 11, 2024. Steinberger stated she visited the minors' foster parents' home every month and observed that M.C. and N.C. "seemed really happy, and they were having a really strong bond with [their] foster parents" and they would "refer to them [as] mommy and daddy." She explained that the foster parents "encourage[d] them to preserve [their] Hispanic heritage" by "reading Spanish books to them[ and] singing Spanish songs together." Steinberger described the home as clean and safe. She stated that the foster parents provided food, clothing, love, and affection to the children. They also attended community activities and had support through their church. The foster parents were willing to adopt the children.

¶ 14        Steinberger observed visits between the children and their biological parents and testified that when the children were removed from the mother's custody in August 2024, "both of the girls didn't show emotions." Beginning in October 2024, N.C. "struggle[ed] with separation from [her] foster mom" when she was dropped off for visitation. Steinberger explained that respondent "never came prepared" to his visits with the children and was "on his phone" or "asking [her] what time the visit will end" to let his ride know. He brought toys that were provided by his mother. Respondent was "more engaged to ask [Steinberger] about [herself] *** rather than engage[d] with his own children," and he would just "sit[ ] on the couch watching them play." Steinberger said that on one occasion in February 2025, respondent asked her how to change N.C.'s diaper. At some visits, respondent arrived "very thirsty, sweating, his eyes were red, and he was very anxious." At the end of their visits, M.C. had "a really hard time saying goodbye to mom and to dad," while N.C. was excited to return to their foster parents. When the children left visitation, they would "run towards [the foster parents] *** screaming [']mommy and daddy.['] " Steinberger

- 5 -

acknowledged there was a bond between the children and respondent, as well as between the children and respondent's family. However, she believed the bond between the children and the foster parents was stronger. Steinberger testified that placing the children with respondent's parents was not an option because of "their knowledge and complicity in mom and dad having contact."

¶ 15　　　　One of the foster parents, Amy B., testified next. She stated that N.C. had been in the care of her and her husband, Jonathan, since September 2024 and M.C. had been in their care since November 2024. She explained that she provided food and clothing for the children, who shared a bedroom. She said that M.C. enjoyed playing with baby dolls, play kitchens, "sensory things like Play-Doh, kinetic sand," and "a sensory table where they can play with, like, dried macaroni." Amy had a background in education. She explained that both girls were on target developmentally and that M.C. was attending speech therapy. The children had a relationship with both Amy's and Jonathan's parents and called the former "grandma and grandpa" and the latter "granny and papa." The girls attended pediatrician appointments as needed. Amy testified she and her husband were willing to adopt the children.

¶ 16　　　　Respondent testified that he loved his children and had attended every visit. He acknowledged there was "some truth to what [Steinberger] said" about his visits, "but not entirely." He explained that M.C. was always excited to see him and ran to him. He bought them "a lot of presents for Christmas." He testified that he played with them and would "pick them up," "fly them around," and "throw them in the air." He acknowledged that he struggled with changing N.C.'s diaper because he had not had custody of the girls at all. He said the children had a connection with his parents, but he "wouldn't say it's the best[ ] connection." He testified that it was in the best interests of the children that his parental rights remain intact.

¶ 17        The guardian *ad litem* briefly reported that he visited the foster home and observed the children with the foster parents. He said "both of the girls were very affectionate towards both foster parents" and "[t]here are plenty of toys for the kids." He did not have any concerns about the care the children were receiving in the foster home.

¶ 18        The trial court found that the State proved by a preponderance of the evidence that it was in the best interests of the children to terminate the parents' parental rights. The court noted that the children were "extremely bonded to the foster parents, and the foster parents provide more than adequate physical safety and welfare for them, food, shelter, [and] clothing" and that "[t]hey're healthy." The court emphasized that the minors "have gone through a lot *** in their very short lives and have had some placement issues due to prior family placement being complicit in the violation of the prior no contact." The court explained that "it's very important for these girls to have continuity and permanence and stability, and this foster family clearly provides it." The girls also "have ties to church and extended family." The court acknowledged that "there is a bond there, *** especially with the older daughter and her mom," but noted Steinberger's testimony that the "children really didn't have much emotion" when they were removed from their mother's care and that N.C. had separation anxiety from her foster mother at visits. The court went on to say that "both parents really do love their daughters, but I have to look at what is in the best interest of the girls and where do they have the most support and stability and permanence and where are they—you know, it's not just are they loved more or less." The court noted that "these girls are Hispanic" and the "foster parents are supporting their heritage and providing them with Spanish, like, flashcards and books and songs and things like that." Ultimately, the court found that "all [of the best-interests factors] favor termination except for the child's wishes which is really not able to be evaluated" due to their young age. The court made a final note that "the

conduct of the parents is not central to this," but rather, "[i]t is what is in the best interest of the children."

¶ 19    This appeal followed.

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, respondent argues that the trial court's best-interests finding was against the manifest weight of the evidence.

¶ 22    Initially, we note that this is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under that rule, this court is required to issue its decision within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). The notice of appeal in this case was filed by respondent in the trial court on May 7, 2025. Illinois Supreme Court Rule 303(a)(4) (eff. July 1, 2017) requires the clerk of the circuit court to file the notice of appeal with the clerk of the court to which the appeal is being taken within five days of the filing of the notice of appeal. However, the circuit clerk of Tazewell County evidently failed to do so, as the notice of appeal was not received by this court until October 14, 2025. As a result of this delay, the briefing in this case was not completed until December 23, 2025. Though the parties do not raise this issue on appeal, this delay is a serious problem in an accelerated case dealing with parental rights, which need to be decided in a timely fashion for the benefit of both the parents and the children. Based on the filing of the notice of appeal in the trial court, our disposition was due to be filed by October 4, 2025—before the notice of appeal was even filed in the appellate court. Because of the delay in filing the notice of appeal in this court, we find good cause exists to issue our decision after the 150-day deadline.

¶ 23    Turning to the merits of this appeal, the involuntary termination of parental rights involves a two-step process pursuant to section 2-29(2) of the Juvenile Court Act of 1987 (Juvenile

Court Act) (705 ILCS 405/2-29(2) (West 2024)). The State must first prove by clear and convincing evidence that the respondent is unfit. *In re C.M.*, 305 Ill. App. 3d 154, 163 (1999). If a parent is found to be unfit, the State must then prove that terminating parental rights is in the minor's best interests. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31. At this step, the focus shifts from the parent to the child. See *In re D.T.*, 212 Ill. 2d 347, 364 (2004) ("[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life."). The burden on the State at the best-interests hearing is a preponderance of the evidence. *D.T.*, 212 Ill. 2d at 366.

¶ 24        When determining a minor's best interests, the trial court must consider the following factors,

"in the context of the child's age and developmental needs:

(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

- 9 -

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals ***;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child ***."

705 ILCS 405/1-3(4.05) (West 2024).

¶ 25 The trial court's best-interests determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *J.B.*, 2019 IL App (4th) 190537, ¶ 33. We afford great deference to the court's determination, as it is in the best position to view the witnesses and judge their credibility. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71.

¶ 26 Here, the trial court's best-interests finding was not against the manifest weight of the evidence. The court properly emphasized the children's need for permanence, their sense of attachments, and their physical safety and welfare. The evidence showed that the foster parents provided food, shelter, health, and clothing to the minors. See 705 ILCS 405/1-3(4.05)(a) (West 2024). The siblings were placed together, and the foster parents ensured they were involved with their Hispanic culture and heritage through reading books and singing songs in Spanish. See 705 ILCS 405/1-3(4.05)(b), (c), (g) (West 2024). The minors were attached to their foster parents, who they called "mommy and daddy." N.C. displayed separation anxiety when leaving her foster parents, and both children were excited to return to them after visits. The minors had a relationship

with their foster parents' parents, who they called "grandma and grandpa" and "granny and papa." See 705 ILCS 405/1-3(4.05)(d) (West 2024). The minors attended community events and were involved in their church community. See 705 ILCS 405/1-3(4.05)(f) (West 2024). Their foster parents expressed their desire to adopt both girls. See 705 ILCS 405/1-3(4.05)(j) (West 2024).

¶ 27 Other than the four-month period between April and August 2024 when they were in the mother's custody, M.C. and N.C. have been in foster care their entire lives. The trial court reasonably placed significant weight on the minors' need for permanence, which respondent could not offer, as he stipulated that he failed to make reasonable progress toward the return of the minors to his care. See 705 ILCS 405/1-3(4.05)(g) (West 2024). Especially where respondent acknowledged there was no possibility that the minors could return to his custody, allowing him to nevertheless maintain his parental rights would leave the minors in limbo, unable to return to their parents' care and yet unable to be adopted. The record shows that respondent cares about his children; however, "at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364.

¶ 28 Respondent contends that the trial court "failed to consider the lack of time spent with the last foster placement and the availability of other relative foster placements." However, respondent fails to cite any authority that the failure to place M.C. and N.C. with their relatives is a basis for overturning a best-interests order. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (establishing that the argument section must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities," and "[p]oints not argued are forfeited"). In fact, under the Juvenile Court Act, "when guardianship is placed with DCFS, the statutory format does not permit the court to dictate to DCFS exactly where custody must be placed." *In re T.L.C.*, 285 Ill. App. 3d 922, 926 (1996). Therefore, the purpose of the best-interests hearing was not to

determine a placement for the minors but to determine whether it was in the minors' best interests to terminate respondent's parental rights and therefore make the minors available for adoption.

¶ 29    As respondent notes, at the time of the best-interests hearing, M.C. had spent only a little over five months in this foster placement, and N.C. had been in that placement a little over seven months. However, the length of time spent in a particular foster placement is not a statutory factor to consider, and in some cases, it is in the best interests of a minor to terminate parental rights even where there is no currently available placement for adoption. See *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002) (holding that the minors' likelihood of adoption is "merely one factor to consider" and even "a child's slim chance of adoption does not *per se* require a finding that termination of parental rights is not in the child's best interest"). Here, considering the other factors and the bond that was clearly apparent between the minors and foster parents, regardless of the duration of the placement, the trial court's conclusion that terminating respondent's parental rights was in the minors' best interests was not against the manifest weight of the evidence.

¶ 30                          III. CONCLUSION

¶ 31    For the reasons stated, we affirm the trial court's judgment.

¶ 32    Affirmed.