NOTICE
Decision filed 06/04/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260090-U

NOS. 5-26-0090, 5-26-0091, 5-26-0092 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* AIDEN M., SOPHIA M., and KHAI B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Piatt County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 21-JA-16, 21-JA-17, |
| | ) | 22-JA-31 |
| Amanda W., | ) | |
| | ) | Honorable Dana C. Rhoades, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's judgment terminating Mother's parental rights was not against the manifest weight of the evidence where the State met its burden of proving best interest. Therefore, the judgment of the circuit court is affirmed.

¶ 2    The respondent, Amanda W. (Mother), appeals from the February 2, 2026, order of the Piatt County circuit court terminating her parental rights over her three minor children. On appeal, Mother challenges only the court's determination that it was in the minors' best interests to terminate her parental rights. For the reasons explained below, we affirm.

1

¶ 3                                  I. BACKGROUND

¶ 4                    A. Adjudication of Neglect and Initial Proceedings

¶ 5     This case began on October 8, 2021, when the State filed petitions for adjudication of neglect regarding Aiden M. and Sophia M. The petitions identified Mother as the minors' mother, and alleged that the minors were neglected by reason of an environment injurious to their welfare because they were exposed to domestic violence and substance abuse.[1] The circuit court held a shelter care hearing, after which it entered a temporary custody order placing the minors in the temporary care of the Illinois Department of Children and Family Services (DCFS).

¶ 6     The circuit court entered an adjudicatory order on February 7, 2022, finding Aiden and Sophia to be neglected by Mother pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act). 705 ILCS 405/2-3(1)(b) (West 2020). Its findings were based on the fact that police responded to Sophia's report of domestic battery in the home. The minor also reported that Mother abused alcohol and marijuana, which the police corroborated through drug testing. The adjudicatory order also stated that Mother had a history of domestic violence, and had previously been offered domestic violence services. The circuit court granted the State's petitions and placed the minors under the guardianship and custody of DCFS on March 8, 2022, pursuant to a dispositional order.

¶ 7     On October 11, 2022, the State filed a petition for adjudication of neglect against Mother and an unknown father[2] regarding the newborn minor Khai B. The State alleged that the minor was neglected due to an environment injurious to his welfare because he was exposed to substance

_____

[1]The petitions also named the minors' father, who also had his parental rights terminated in the underlying proceedings. As he is not a party to this appeal, we do not discuss him here unless relevant. We note that the petitions specified that Mother was the alleged cause of the minors' exposure to substance abuse.

[2]No purported father ever came forward, nor was DCFS ever able to confirm the paternity of any individual as to Khai B.

abuse and because Mother had failed to correct the conditions that led to the two older minors' removal. The circuit court entered a temporary custody order the same day, naming DCFS as Khai's temporary guardian. On January 28, 2023, the circuit court entered an adjudicatory order finding that Khai was neglected by Mother pursuant to section 2-3(1)(b) of the Juvenile Court Act. 705 ILCS 405/2-3(1)(b) (West 2022). The court entered a dispositional order in Khai's case on February 22, 2023, placing him under the guardianship of DCFS.

¶ 8                                  B. Fitness Hearing

¶ 9     The State filed motions seeking findings of unfitness and the termination of Mother's parental rights as to the three minors on October 2, 2024. In all three cases, the State alleged that Mother was an unfit parent for failure to make reasonable progress toward the return of the minors during the nine-month post-adjudicatory period of January 1, 2024, through October 1, 2024, pursuant to section 1(D)(m)(ii) of the Adoption Act. 750 ILCS 50/1(D)(m)(ii) (West 2022).

¶ 10    The circuit court held a fitness hearing on March 24, 2025. At the hearing, Mother stipulated to the State's fitness allegations in all three cases. The circuit court read each allegation and confirmed with Mother that she was admitting to them, and that her stipulations were voluntary, knowing, and unforced. The State then provided its factual basis, stating that Mother was assigned mental health, substance abuse, and domestic violence services. She completed assessments for each service, and successfully completed "some services," including parenting. However, she failed to maintain progress in those services during the nine-month period from January 1, 2024, through October 1, 2024. The State would present the testimony of police officers and caseworkers, which would show that Mother had several incidents involving the police, including three during the relevant period. In all three instances, she appeared to be under the influence of alcohol.

3

¶ 11    The State further provided that Mother had participated in mental health services but did not make sufficient progress on those services according to her counselor, and "alcohol remained an issue" at the end of the relevant period. Mother's counsel stipulated that the State would be able to present evidence on all aforementioned points. After hearing testimony and argument on the State's allegations against Aiden and Sophia's father, the circuit court delivered its findings that both the father of these minors and the unknown father of Khai B. were unfit. The court changed the permanency goal for all three minors from return home within 12 months to substitute care pending the court's best-interest findings. The matter was set for a best-interest hearing.

¶ 12                                        C. Best-Interest Hearing

¶ 13    Webster Cantrell Youth Advocacy (WCYA) filed a best-interest report on June 18, 2025, in which it provided notes on each relevant statutory factor as applied to each minor. Regarding Sophia, the report stated that she had been living with her paternal aunt and her husband since December 2024. Both foster parents were employed and financially able to care for her. Sophia had her own bed and her own space in the home, but shared a bedroom with another female child. The caseworker conducted monthly home inspections and found Sophia's home environment to be safe and the family to be nurturing. Her foster family met all of her needs, including keeping her medically up to date, and there were no concerns about her wellbeing.

¶ 14    Sophia, who was 11 at the time, expressed to the caseworker that she wished to remain with her foster family. The caseworker described her as doing well and not displaying any signs of emotional distress. There were no concerns about her ability to identify her caregivers. She enjoyed playing and doing various activities around the home and the foster parents' farm. She was attending counseling to help her process her feelings, and she expressed that she enjoyed speaking with her counselor. Since Sophia was placed with family, her background, cultural, and

4

religious ties remained unchanged. Her brother Aiden was also placed with this family, so the siblings were living together.

¶ 15    The foster family was involved in and supported by their community. Sophia had lived in this community since birth, had friends there, and participated in various events and recreational activities. She was doing well in school and continued to improve academically, with the help of her foster parents. Sophia had built a strong attachment to her foster parents and foster siblings, and she identified her foster parents as her parental figures. Her foster parents continued to provide physical and emotional support to her in order to foster this attachment further.

¶ 16    The caseworker wrote that the foster family had "gone above and beyond" to provide Sophia a safe and loving environment and to support her permanency goals. Sophia was thriving and well-adjusted in her current placement, and was surrounded by people who love and care for her. Her foster parents also attempted to maintain a relationship with Sophia's biological parents. WCYA had no concerns about Sophia staying in her current placement. Her foster parents were committed to providing her with permanency through guardianship.

¶ 17    Eight-year-old Aiden, as previously mentioned, had also been placed with his paternal aunt and her family since December 2024. The caseworker made similar observations about his safety and wellbeing in the home as she had regarding Sophia. Aiden had his own room in the home, and all of his physical and emotional needs were being met, including up-to-date medical care. Aiden was also thriving in his current placement and showed no signs of emotional distress, nor did the caseworker have any concerns about his wellbeing. Regarding his identity, his background, cultural, and religious ties, and his involvement in the community, the caseworker again had similar observations as she had for Sophia. He was doing well in school and his foster parents helped him to thrive academically. Aiden was enrolled in counseling, which was going positively.

¶ 18    Aiden was also strongly attached to his foster family and identified his foster parents as his parental figures, and the family continued to provide him with physical and emotional support. He had expressed a desire to remain with his foster family. His foster family had worked just as hard to provide him a safe and loving environment as they had for Sophia. WCYA had no concerns about his remaining in this placement. The foster parents were committed to providing him with permanency through guardianship.

¶ 19    Lastly, two-year-old Khai had been living in a traditional foster placement since December 2024. His foster parents were financially able to care for him, and could provide him with all the time and attention he needed. Khai had his own bed in a room he shared with another boy. The caseworker had conducted monthly home inspections of the foster home, and found it to be a safe environment with nurturing foster parents. All of Khai's needs were met, he was up to date on medical care, and there were no concerns regarding his wellbeing.

¶ 20    Due to his young age, Khai was not able to express his wishes about his living situation, but his actions and behavior indicated that he was happy in his current placement and loved his foster parents. He was thriving in the home, enjoyed playing and other activities, and had built a strong attachment to his foster parents, who he called "Mommy" and "Daddy." His background, cultural, and religious ties remained unchanged in this placement, and while he was living in a different city than his place of birth, he was active in community events and recreation where he currently lived. He was also making friends in this community.

¶ 21    Khai's foster parents worked hard to provide him with a safe and loving environment, and treated him as if he were their biological child. They also involved him with their extended family and friends. Khai was loved and cared for in this placement, and there were no concerns regarding

his wellbeing. The foster parents were committed to providing Khai with permanency through adoption.

¶ 22    The circuit court held a best-interest hearing on June 30, 2025, at which it heard testimony from Mother. The State did not call any witnesses or provide any other evidence at the hearing, and only referred to the best-interest report. The circuit court found that it was in the minors' best interests that Mother's parental rights be terminated. Mother appealed, and this court reversed the circuit court's judgment, finding that the State failed to properly admit the report into evidence. *In re Aiden M., et al.*, 2025 IL App (5th) 250550-U.

¶ 23    The circuit court set the matter for another best-interest hearing on January 29, 2026. Prior to the hearing, on January 9, 2026, WCYA filed an updated best-interest report. In addition to the previous report's observations, the updated report stated that Sophia's mental health was improving, and her grades were good. Her foster parents maintained communication with the maternal side of Sophia's family, as well as with her biological father. Since the previous report, the foster parents had passed the legal screening required for guardianship. These last two points also applied to Aiden, who was living in the same foster placement. Lastly, Khai also continued to do well in his current placement.

¶ 24    At the January 29, 2026, hearing, the circuit court took judicial notice of the updated best-interest report and it was properly entered into evidence. The court then heard the testimony of WCYA caseworker Jalisa McClennon, testifying for the State. She explained that she had been assigned to the minors' cases for approximately the past three years and participated in preparing the best-interest report. McClennon testified to the contents of her report, beginning with Aiden and Sophia's placement with the family of their paternal aunt. She stated that the aunt and her husband did foster other children, and they had one adopted child in the home. McClennon found

7

the home to be safe and appropriate, and the foster parents adequately provided for the minors' safety and welfare. Sophia and Aiden were previously on medication for depression and ADHD, respectively, but had improved to the point of no longer needing it. Both minors were also doing well in school.

¶ 25    McClennon testified that she spoke with both minors about living with their aunt and uncle. Sophia expressed that she was "fine with being there," but "she wanted to live with [Mother] if it was possible." However, Sophia understood the situation and was "completely fine with doing the guardianship." Aiden, who was nine, did not understand everything as well, but McClennon described him as happy and fine with living with his aunt and uncle. McClennon also confirmed that the foster parents' preferred arrangement was guardianship.

¶ 26    Sophia and Aiden had frequent visitation with other family as well, including their maternal grandmother, paternal grandfather, father, another aunt, and their oldest sister. They also spent some weekends and other days with Khai. Both minors were also opening up more and doing well in counseling.

¶ 27    McClennon testified that three-year-old Khai had lived in his traditional foster placement since December 2024—for most of his life. McClennon had also visited this home, where Khai lived with his foster parents and their oldest daughter. McClennon believed that Khai had a strong bond with his foster parents, and considered them his parents. The foster parents had built a good relationship with Sophia and Aiden's foster parents in order to maintain sibling contact. The foster parents also facilitated Khai's contact with his maternal grandmother. They adequately provided for his needs, and were willing to adopt.

¶ 28    On cross-examination, McClennon stated that she did not know of any contact between Mother and the minors while she was incarcerated. She was also asked whether the older minors

8

asked about Mother and whether McClennon had explained the guardianship to them. She testified that the minors did not ask about her, and that she believed that both minors were too young to have a full understanding of the situation.

¶ 29    Next, Mother testified from Illinois Department of Corrections (IDOC) custody. She stated that her expected release date was January 28, 2028. She said that she was told by her mother that DCFS would not allow her to contact the minors through cards or letters, but that her mother said Sophia asked about her regularly. Mother also spoke about the classes and services she had voluntarily taken while incarcerated, including a domestic violence class, substance abuse counseling, and anger management. The State stipulated that Mother had completed these courses. Mother also testified that she was currently working and in school, and had not had any disciplinary issues while in IDOC custody. She was also eligible for credit on her sentence for some of the classes she was taking.

¶ 30    Mother stated that she was opposed to Sophia and Aiden having a legal guardian and Khai being adopted, but she recognized that she could not care for the minors while incarcerated. She also said that while Khai was being well taken care of in his placement, she wanted the opportunity to be his mother, as he was taken from her when he was only six days old.

¶ 31    After hearing arguments, the circuit court took the matter under advisement. The court entered an order terminating Mother's parental rights on February 2, 2026. It also explained its decision in a written memorandum order, in which the court mentioned taking notice of the best-interest report, and summarized McClennon's testimony regarding the appropriateness and safety of the minors' current placements. The court further wrote that the welfare of the minors in these placements was not a concern. The court noted that if Mother's parental rights were terminated, the permanency goal for Sophia and Aiden would become guardianship, and for Khai, adoption.

9

McClennon also told the court that both foster families intended to maintain the minors' current contact with their maternal grandmother.

¶ 32 The circuit court also summarized Mother's testimony, writing that she spoke about the coursework and services she took advantage of while incarcerated, some of which qualified for time off of her sentence. The court stated that Mother seemed to acknowledge that the minors' current placements were in their best interests while she was in IDOC custody, but that she did not agree to the proposed changes in permanency goals. She also testified to wanting the opportunity to be a mother to Khai, since he had been in DCFS care for most of his life. The court wrote that Mother's "efforts [during incarceration] deserve credit and recognition," but that the primary concern here was the minors' need for long-term stability and permanency.

¶ 33 The circuit court then considered the best-interest factors as applied to each minor. It noted that the older minors had been in care since 2021, and Khai, since 2022. Sophia and Aiden were doing well in school, showed improvements in their mental health, and had contact with other family. Sophia did express her wish to live with Mother, which the court stated was normal for a preteen girl, but that Mother could not be considered a potential caregiver at this time, due to her incarceration. Khai had been in his current foster placement for most of his life and had developed a strong bond with the family.

¶ 34 Thus, the circuit court found that the evidence showed that the foster families cared for the minors' stability and permanency, continuity in placement, and safety and welfare. Based on the totality of the best-interest factors, the court concluded that it was in the minors' best interests that Mother's parental rights be terminated. This appeal followed.

10

¶ 35                                    II. ANALYSIS

¶ 36     On appeal, Mother argues that the circuit court's finding that termination of her parental

rights was in the minors' best interests was against the manifest weight of the evidence. She

concedes that there is no meritorious argument to be raised challenging the circuit court's unfitness

finding.

¶ 37     A parent's right to raise his or her child is a fundamental right, which a court may not

terminate without the parent's consent except as authorized by statute. *In re Gwynne P.*, 215 Ill.

2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is

governed by the Juvenile Court Act and the Adoption Act. *Id.* Pursuant to the Juvenile Court Act,

the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221

Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the

parent is an "unfit person" as defined by section 1(D) of the Adoption Act. *Id.*; 705 ILCS 405/2-

29(2) (West 2024); 750 ILCS 50/1(D) (West 2024). If the court makes a finding of unfitness, it

next considers whether termination of the parent's rights is in the best interests of the child. *In re

Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024).

¶ 38     Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental

rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should*

be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's

interest in maintaining the parent-child relationship "must yield to the child's interest in a stable,

loving home life." *Id.* At this stage of the termination hearing, the State bears the burden of proving

by a preponderance of the evidence that termination of parental rights is in the child's best interest.

*In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

11

¶ 39 In making a best-interest determination, the court must consider several factors, within the context of the child's age and developmental needs. 705 ILCS 405/1-3(4.05) (West 2024). The factors are as follows:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

¶ 40 As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *Id.* ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 41 On appeal, Mother argues that the circuit court's ruling was against the manifest weight of the evidence because the balance of statutory best-interest factors does not favor termination of her parental rights. She admits that the following factors did favor termination: (1) the physical safety and welfare of the children, as it was undisputed that all three were safe in their current placements; and (2) community ties, as there was testimony that the two older children were doing well in school and the youngest was set to begin preschool in his community. She argues that the following factors favor neither side: (1) background and family ties, as the minors have ties to Mother, Sophia and Aiden are placed with family, and Khai's foster family agreed to facilitate sibling contact after adoption; and (2) the preferences of persons available to care for the minors, as all parties "are willing to care for the children."

¶ 42    Of the remaining factors, Mother first argues that the development of the minors' identities falls in her favor because Sophia wished to preserve the identity that she had developed with Mother. She concedes that Khai had been with his foster family since birth and did not develop an identity under Mother's care, but argues that he should be afforded the opportunity to do so. She further admits that Khai and Aiden were too young to understand this issue in the proceedings.

¶ 43    She next argues that the factor of the minors' feelings of attachment favors her because Sophia clearly loves her mother, feels attached to her, and has security, familiarity, and affection with her. She concedes that Aiden did not have an opinion, due to his young age, but states that he lived with Mother for most of his life. She further concedes that Khai did not spend time in her care, but argues that he "should not be deprived of the opportunity." She also contends that the factor of the minors' wishes falls in her favor as applied to Sophia, the only child old enough to express her wishes. Mother notes that the circuit court acknowledged in its decision that Sophia indicated a desire to return to Mother.

¶ 44    As for the minors' need for permanence, Mother argues that while Khai's foster family expressed a desire to adopt, Aiden and Sophia's did not. Mother contends that guardianship—the form of permanence the latter foster family sought—could be easily changed and was reliant on the guardian's continued willingness to serve in that role. By contrast, Mother states that she is willing to offer actual permanence for her children. Mother specifically questions the foster family's motivations for selecting guardianship over the more permanent adoption, and challenges the validity of terminating her parental rights in favor of the potential guardians, especially since the guardianship terminates in the future. She alleges that the factor of the risks attendant to substitute care falls in her favor for the same reason.

¶ 45    Lastly, Mother challenges the circuit court's finding that Sophia could not be returned to Mother despite the child's wishes because Mother could not be considered a caregiver due to her incarceration, which she describes as a temporary condition. She states that, since the court gave no other reasons, there was no reason the minors could not be returned to her upon her release, as long as she was released before the guardianship terminated.

¶ 46    We initially note that Mother's primary argument as to why returning the minors to her would be in their best interest, rather than why keeping them in their current placements would *not*, is her willingness to care for them and her desire to have them grow up with a connection to her. Mother's love and affection for her children, as well as her wishes to have them in her care, are not relevant considerations in the best-interest analysis. See *In re D.T.*, 212 Ill. 2d at 364. Furthermore, Mother recognizes that she cannot care for the minors while in IDOC custody, which she is expected to be until 2028.

¶ 47    Additionally, Mother admits that Khai spent the majority of his life with his foster family rather than in Mother's care, and she testified that he was being well cared for in his current placement. Thus, his identity, attachments, community belonging, and sense of permanency were built with his foster family, and his foster parents were the only parental figures he had ever known. She further acknowledges that Khai and Aiden were too young to articulate their wishes. Lastly on the point of family, while the minors' potential future contact with Mother is relevant to their family ties, the evidence showed that, in their current placements, the minors were able to maintain contact with a range of family members, as well as with each other. The older minors were also placed with family, which allowed them to keep their background, cultural, and religious ties intact.

14

¶ 48    Mother also places great emphasis on the evidence that Sophia expressed wishes to live with her. However, the circuit court appropriately balanced this consideration with the other evidence, and concluded that this was expected and understandable in a preteen girl, but that she could not return to Mother while Mother was incarcerated. Furthermore, McClennon's testimony indicated that Sophia was able to understand her situation to an age-appropriate extent, and McClennon observed in the WCYA report and in her testimony that Sophia felt positively about living with her aunt and uncle. She was also noted to be thriving in all areas of her life in this placement. Notably, both she and Aiden no longer needed medication for mental health conditions while living with their aunt and uncle.

¶ 49    The circuit court also acknowledged that Sophia and Aiden's foster parents were seeking guardianship rather than adoption. However, nothing in the record suggests that the foster parents were not prepared to provide the minors with stability, continuity, and permanency by becoming their guardians. Indeed, the circuit court noted McClennon's uncontroverted testimony that they were willing to provide permanency for Sophia and Aiden. There was no evidence presented challenging the foster parents' commitment to caring for the minors in every way. Lastly, as the State argues in response to Mother, the relevant statutory factor in the Juvenile Court Act does not treat guardianship as a lesser outcome than adoption, stating "the preferences of the persons available to care for the child, including willingness to provide permanency to the child, *either through* subsidized guardianship or through adoption." (Emphasis added.) 705 ILCS 405/1-3(4.05)(j) (West 2024).

¶ 50    In its memorandum order, the circuit court detailed its reasoning regarding certain statutory factors, and concluded with a statement that it had considered all factors, whether explicitly mentioned or not. Contrary to Mother's argument on appeal, the court did not terminate her

15

parental rights based solely on the fact that she is presently incarcerated. As we have stated, the court clearly considered all relevant statutory best-interest factors and weighed all of the evidence presented. We find no basis to override the circuit court's discretion in making its findings, and we determine that its decision was not against the manifest weight of the evidence.

¶ 51    In conclusion, we find that the circuit court's best-interest determination, as well as its decision to terminate Mother's parental rights over the three minors, was not against the manifest weight of the evidence.

¶ 52                                    III. CONCLUSION

¶ 53    For the reasons stated, the circuit court did not err in terminating Mother's parental rights. The judgment of the circuit court is affirmed.


¶ 54    Affirmed.